PUBLIC CITIZEN et al., and Machinery
Dealers National Association,
Appellant,

v.

LOCKHEED AIRCRAFT
CORPORATION et al.

No. 75–1958.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 22, 1976.

Decided Aug. 25, 1977.

Larry P. Ellsworth, Washington, D. C., with whom Alan B. Morrison, Washington, D. C., was on the brief, for appellant.

Kenneth C. Bass, III, Washington, D. C., with whom Fred M. Vinson, Jr., Washington, D. C., was on the brief, for appellee, Lockheed Aircraft Corp.

Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Jacques B. Gelin and Herbert Pittle, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellee, General Services Administration.

Before DANAHER, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

The present appeal requires this court to delve once more into the ever-increasing underbrush of legal precedents applying the doctrine of standing to challenge administrative acts by a federal agency. The appellant, Machinery Dealers National Association (MDNA), is a trade association representing approximately 350 members who buy and sell used industrial machinery. Along with a senator and three congressmen,[1] MDNA sought declaratory and injunctive relief invalidating a negotiated sale by the General Services Administration (GSA) of real and personal property of the federal government[2] to Lockheed Corpora-

[1] This lawsuit did not originally include MDNA as a plaintiff, but did include a public interest organization and an individual taxpayer. In the words of the district court "[f]ollowing the decisions in *United States v. Richardson*, 418 U.S. 166 [94 S.Ct. 2940, 41 L.Ed.2d 678] (1974) and *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 [94 S.Ct. 2925, 41 L.Ed.2d 706] (1974), which cast doubt on the standing of [the public interest organization] and the taxpayer to maintain this action, an amended complaint was filed dropping these parties as plaintiffs and adding the Machinery Dealers National Association as a plaintiff." Memorandum and Order of January 8, 1975, J.A. at 31. Lockheed contends that MDNA's involvement was "solicited" by the attorneys for the public interest organization who now represent MDNA without charge and argues that the court should exercise its "prudential" authority to refuse to review MDNA's claims because MDNA is not a true party in interest.

The district court did not reach "the difficult and troubling issues raised by Lockheed regarding MDNA's participation in this case as a mere 'sham' plaintiff." *Id.* at 32. We too do not reach this issue because we find that MDNA lacks standing for other reasons.

[2] For convenience, the parties have referred to the aggregate properties as "Plant No. 14" and hereinafter we also will use that term. Plant No. 14 consists of 218 acres of land and 91 buildings housing a substantial quantity of industrial machinery and equipment. The land and buildings, located in Burbank, California, were originally acquired or constructed during the Second World War and most of the machinery was acquired during the 1960's. Plaintiff's Response to Lockheed's Statement of Material Facts As To Which There Is No Genuine Issue (hereinafter "Plaintiff's Response"), J.A. at 58. Not all of the buildings and machinery was owned by the federal government; some

tion on the grounds that the sale violated the Federal Property and Administrative Services Act (the Act), 40 U.S.C. § 471 et seq. (1970).[3] MDNA does not seek relief for injuries to any institutional interest, but claims only to represent its member-firms which "[a]s potential purchasers of some of the property which was sold to Lockheed and as potential sellers of used machinery to Lockheed . . . suffered economic harm as a result of the illegal acts of GSA . . . ."[4]

■ Upon Lockheed's motion, which was joined by GSA, the district court dismissed the plaintiffs' complaint.[5] The district court determined that MDNA lacked standing because the interests of its members affected by the sale are not arguably within the zone of interests protected by the Act.

Although we rest our conclusion on a different basis, we agree that MDNA has not demonstrated that it has standing to seek judicial review of GSA's sale of Plant No. 14 to Lockheed, and therefore affirm the judgment of the district court.

## I. BACKGROUND

### A. The Statutory Scheme

Any sale of government property to a private party must comply with the provisions of the Federal Property and Administrative Services Act. Under the Act, property subject to the control of a federal agency which is not required for the discharge of the agency's responsibilities may be declared "excess".[6] GSA then determines whether any other federal agency

---

was owned by Lockheed. As described by MDNA, the government-owned portions of Plant No. 14 were "connected" to those owned by Lockheed. Lockheed and GSA characterize the property as "scrambled". Prior to the challenged sale, Lockheed operated all of the buildings and machinery as part of a defense production facility under contractual authorization from the Department of Defense.

3. MDNA based its claim to federal court jurisdiction over the complaint on the Judiciary Act, 28 U.S.C. § 1331 (1970), as amended by Pub. L.No. 94–574, § 2, 90 Stat. 2721 (eliminating jurisdictional amount in suits against federal officers), and § 1361 (1970); and the Administrative Procedure Act, 5 U.S.C. §§ 702–703 (1970), as amended by Pub.L.No. 94–574, § 1, 90 Stat. 2721, and §§ 704–706 (1970).

4. Amended Complaint ¶ 5, J.A. at 10.

5. By order dated Jan. 8, 1975, MDNA's claims were dismissed for the benefit of Lockheed, GSA having been inadvertently omitted. J.A. at 31. The omission was corrected by order dated Jan. 20, 1975, granting dismissal for the benefit of GSA nunc pro tunc. J.A. at 35. Affidavits and depositions were submitted by Lockheed in support of its motion to dismiss. The motion, therefore, should properly be treated as one for summary judgment, Fed.R.Civ.P. 12(c), and, although the district court appears to have limited its analysis to the allegations of the complaint, the affidavits and depositions are properly included in the record on appeal.

The district court found that MDNA's allegations of economic injury to its members constituted an attempt to obtain standing to challenge GSA's conduct of the sale of Plant No. 14 as competitors, and that, as such, the question

of MDNA's standing to invoke federal court jurisdiction under § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, was governed by Ass'n of Data Processing Service Org., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The three-part standard established by the Supreme Court therein requires that a claimant seeking standing as a competitor injured through administrative action of a federal agency must allege (1) that due to the challenged action, he incurred an "injury in fact" within the meaning of Article III of the U.S. Constitution; (2) that the interest thereby injured is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question; and (3) that review of the administrative action is not otherwise precluded. Without determining if MDNA's allegations of injury met the requirements for an Article III "injury in fact", the district court found that the Act did not arguably protect the class of competitive interests which MDNA claimed had been injured, and on this basis dismissed the action.

MDNA's subsequent request for reconsideration was denied by order dated Feb. 24, 1975. J.A. at 40. The claims of the congressional plaintiffs were given further consideration, but following the decisions of this court in Public Citizen v. Sampson, aff'd mem., 169 U.S.App. D.C. 301, 515 F.2d 1018 (1975), and Stokes v. GSA, aff'd mem., 169 U.S.App.D.C. 301, 515 F.2d 1018 (1975), the parties consented to a dismissal of these claims which was accomplished by order dated June 18, 1975. J.A. at 42. Notice of appeal was filed by MDNA on Aug. 18, 1975.

6. 40 U.S.C. § 472(e) (1970).

can use the property and, if not, declares the property "surplus".[7] The Act permits GSA or an agency authorized by GSA to dispose of surplus property by sale or other method of transfer "upon such . . . terms and conditions as the Administrator [of GSA] deems proper."[8] The disposing agency must, however, first seek the advice of the Department of Justice as to whether the contemplated disposal would be inconsistent with federal antitrust laws.[9]

With certain exceptions, disposals must be accomplished through publicly advertised, competitive bidding.[10] The advertisement for bids, where required, must be under terms and conditions which "shall permit that full and free competition which is consistent with the value and nature of the property involved,"[11] and GSA must accept that bid which is "most advantageous to the Government, price and other factors considered."[12]

### B. Course of Negotiation, Declaration of Excess, and Effectuation of Sale

Prior to 1968, the government-owned portions of Plant No. 14 were dedicated to the use of and under the control of the Department of Defense (DOD). In that year,[13] DOD entered into negotiations with Lockheed concerning the sale of the plant. Following the initiation of these negotiations, DOD declared Plant No. 14 excess to its needs and responsibilities on two conditions: (1) that the property be sold only to Lockheed, and (2) that Lockheed be required to maintain the plant's defense production capacity for a period of at least five years.[14] Thereafter, the property was transferred to GSA for disposition. Operating on the assumption that no other agency would be interested in obtaining property which DOD would allow to be transferred only to Lockheed and only on the condition that the defense production capacity of the property be maintained for a five year period,[15] GSA declared the property "surplus" without offering it to any other agency. After further negotiations and without advertising publicly for competitive bids, GSA agreed to sell Plant No. 14 to Lockheed.[16] GSA, however, reserved the right to rescind the sale agreement should the Attorney General advise that the sale would be inconsistent with the antitrust laws.

---

7. Id. § 472(g).

8. Id. § 484(c).

9. Id. § 488(a).

10. Id. § 484(e)(1).
    The Act specifies nine exceptions to the bid advertising requirement. Id. § 484(e)(3)(A)–(I). GSA and Lockheed have argued that one such exception justifies the manner in which GSA conducted the sale of Plant No. 14, namely that which allows disposition of real property through sale by negotiation rather than by bid. Id. § 484(e)(3)(G). The statutory provision establishing this exception, however, is silent as to a sale involving "connected" or "scrambled" real and personal property.

11. Id. § 484(e)(2)(A).

12. Id. § 484(e)(2)(C).

13. The parties have not specified the exact date.

14. Plaintiff's Response, J.A. at 58–59, citing Determination of Surplus 9–D–437–C, Oct. 8, 1960.

15. Appellant's Brief at 6 n.2, quoting Determination of Surplus 9–D–437–C, Oct. 8, 1968.

16. Lockheed agreed to pay $30,087,500 for the property and to maintain defense production capacity for a five year period from the date of the transfer. Plaintiff's Response, J.A. at 59. MDNA alleges that the terms of payment were more favorable to Lockheed than those required by GSA's regulations, 41 C.F.R. § 101–47.304–4(a)(3) (1976). The only manner in which MDNA may conceivably argue that its members have been injured by these terms is in the members' claimed interest in competing against Lockheed in reselling used machinery. As discussed infra, Section III.B.3., we find that MDNA has not adequately demonstrated that Lockheed has actually in the past competed against MDNA members or threatens to compete in the future. Because we find on this basis that the sale itself caused no "injury in fact" to MDNA's members, we must conclude that the terms by which the sale was effectuated also cause no "injury in fact" and therefore we need not address these allegations of illegality with any greater detail.

The proposed terms and conditions of the sale were then submitted to the Department of Justice. Throughout a series of correspondence with GSA, the Attorney General's office maintained that the proposed sale in fact was inconsistent with the antitrust laws.[17] Nevertheless, GSA informed Lockheed that it would agree unconditionally to the sale, and the title to the property subsequently was conveyed on May 30, 1973.

### C. Allegations of Illegality and Claim to Relief

MDNA claims that the negotiation and sale of Plant No. 14 to Lockheed violated two provisions of the Act and also constituted arbitrary and capricious action on the part of GSA. First, MDNA contends that DOD could not properly declare Plant No. 14 surplus because the condition requiring Lockheed to maintain the plant's defense production capacity for five years demonstrates that DOD had a continuing need for the plant.[18] Second, MDNA claims that the failure to advertise publicly for competitive bids was unlawful.[19] Third, MDNA argues that GSA acted arbitrarily and capriciously because it ignored the advice of the Attorney General's office that the proposed sale would be inconsistent with the antitrust laws and based the sale price on an outdated appraisal.[20]

On the basis of these arguments MDNA seeks a judicial declaration that GSA's attempted sale to Lockheed was unlawful and of no force or effect and an order requiring GSA to "take immediate steps to exercise full right, title, interest and control over said Property." [21] It is important to note that MDNA seeks only to effectuate a rescission of the sale and does not seek to have the court require a subsequent sale on any specified terms.

---

17. *See, e. g.*, Letter of Mar. 20, 1972, from Walker B. Comegys, Acting Assistant Attorney General for the Antitrust Division to William E. Cassellman II, General Counsel, GSA. The reasons for the Attorney General's conclusion, according to Comegys, were:

> First, the transaction appeared to embody a considerable number of undesireable competitive consequences: giving Lockheed a preferred position over other firms which might wish to acquire such a facility; increasing the concentration of aircraft-production assets in the hands of the largest firms; and threatening foreclosure effects of a kind which have been held to violate the antitrust laws. Second, Plant No. 14 was not in our judgment a 'scrambled' facility, and therefore it could have been offered to additional firms on a competitive bid basis when it was no longer required by Lockheed to fulfill defense contracts.

> *Id.* at p. 1.

18. Amended Complaint ¶ 14, J.A. at 12; Appellant's Brief at 9.

19. Amended Complaint ¶ 16, J.A. at 12.

20. Amended Complaint ¶ 17, J.A. at 12.

21. Amended Complaint, J.A. at 13.

## II. INJURY IN FACT

██ Under the "case or controversy" requirement of Article III of the Constitution, a claim is justiciable in the federal courts only if the claimant has "'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (emphasis in original). Yet in the view we take of this case we do not reach the question whether the injury here alleged meets the "irreducible Art. III case-or-controversy requirements for standing," *United States v. Richardson*, 418 U.S. 166, 180–81, 94 S.Ct. 2940, 2949, 41 L.Ed.2d 678 (1974) (Powell, J., concurring), because we are governed by the Administrative Procedure Act, 5 U.S.C. § 702 (1970), which grants standing to challenge administrative action to any "person suffering legal wrong . . . or adversely affected or aggrieved" by it. *See United States v. Students Challenging Regulatory Agency Procedure (SCRAP)*, 412 U.S. 669, 687–90 & n.14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Scanwell Laboratories, Inc. v. Shaffer*, 137 U. S.App.D.C. 371, 384, 424 F.2d 859, 872 (1970); *cf.* K. Davis, *Administrative Law of the Seventies* § 22.02–11, at 509 (1976); Currie, *The Supreme Court and Federal Jurisdiction: 1975 Term*, 1976 Sup. Ct.Rev. 183, 184. If the plaintiff fails the statutory test of showing the challenged action has adversely affected him, we need not address the constitutional issue. To meet this threshold requirement, a plaintiff must demonstrate [22] that the challenged acts have harmed him or that he personally would benefit in some tangible manner from the court's intervention in the controversy. *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 220–22, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Evans v. Lynn*, 537 F.2d 571, 595 (2d Cir. 1976) (en banc). An association may seek relief not only for any institutional injuries which it might have suffered, but also as a representative of its members if those members would have standing if they themselves brought suit. *Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. 2197; *see Sierra Club v. Morton*, 405 U.S. 727, 734–41, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). As noted above, MDNA has not claimed that it has suffered any injury to an institutional interest. Therefore, its standing to challenge the sale of Plant No. 14 depends on a demonstration that one or more of its members have suffered an "injury in fact".

### A. *Characteristics of Injury in Fact*

██ An "injury in fact" need not be substantial to support federal court jurisdiction over this challenge to agency action; an identifiable trifle will suffice. *United States v. SCRAP, supra,* 412 U.S. at 689 n.14, 93 S.Ct. 2405; K. Davis, *Administrative Law Treatise* §§ 22.09–5, 22.09–6 (Supp.1970). The injury may be one which MDNA's members have already sustained

---

**22.** Normally, mere allegation will suffice, but, if controverted by the defendant, the plaintiff must demonstrate facts supporting his allegations. *See Sierra Club v. Morton*, 169 U.S.App. D.C. 20, 34, 514 F.2d 856, 870 n.20 (1975), *rev'd on other grounds sub nom. Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 26 (1976); *Evans v. Lynn*, 537 F.2d 571, 591 (2d Cir. 1976) (en banc); C. Wright & W. Miller, *Federal Practice and Procedure* § 3531, at 200 (1975). As this court stated in *Metcalf v. National Petroleum Council*, 180 U.S.App.D.C. 31, 44, 553 F.2d 176, 189 n.126 (1977) (emphasis in original), "[w]e are not required to accept *any* allegation of harm; if we were to do this, the court would have no function in determining whether the constitutional requirement of injury in fact has been met. . . . [W]e are required, [however], to accept as true all material allegations and to 'construe the complaint in favor of the complaining party'." We have taken great care in reviewing the full record to identify any and all evidence which, when construed most favorably to MDNA, might support a finding of standing. Even so we have determined that, at best, the injuries claimed are speculative and do not support jurisdiction in a federal court.

or are immediately in danger of sustaining. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Nonetheless, the injury must be perceptible, concrete, specific, *United States v. SCRAP, supra,* 412 U.S. at 689, 93 S.Ct. 2405, and real and immediate rather than conjectural or hypothetical, *California Bankers Association v. Shultz,* 416 U.S. 21, 69, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Golden v. Zwickler,* 394 U.S. 103, 108–10, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). The injury must be particularized, *Schlesinger v. Reservists Committee to Stop the War, supra,* 418 U.S. at 220–22, 94 S.Ct. 2925, and capable of direct redress by the court through the requested remedy. *See Linda R. S. v. Richard D.,* 410 U.S. 614, 617–19, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). A plaintiff may not rely on "the remote possibility, unsubstantiated by allegations of fact, that [his] situation might have been better had respondents acted otherwise, and might improve were the court to afford relief." *Warth v. Seldin, supra,* 422 U.S. at 507, 95 S.Ct. at 2209; *see Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 42–46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Bowker v. Morton,* 541 F.2d 1347, 1349 (9th Cir. 1976).

Standing alone, these generalized criteria for assessing the jurisdictional adequacy of a demonstration of "injury in fact" are nebulous and difficult of application. We must therefore look to the analytical method employed by the Supreme Court in recent decisions for guidance in resolving MDNA's standing claim.

■ In *Linda R. S. v. Richard D., supra,* a mother of an illegitimate child sought an injunction to require prosecution of the putative father under a state statute criminalizing the failure to support a child. The statute had been consistently construed to apply solely to the parents of legitimate children, resulting, according to the mother,

in a challengeable deprivation of equal protection. She claimed standing to present such a challenge in federal court on the basis of economic injury to her interest in securing child support from the father. The Supreme Court observed that, even assuming the requested relief were granted,

it would result only in the jailing of the child's father. The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed speculative. Certainly, the 'direct' relationship between the alleged injury and the claim sought to be adjudicated, which previous decisions of this Court suggest is a prerequisite of standing, is absent in this case.

410 U.S. at 618, 93 S.Ct. at 1149. Subsequent cases have affirmed the principle that a claimant is required to show a substantial probability that the requested relief would benefit him in some perceptible, tangible fashion. *See, e. g., Simon v. Eastern Kentucky Welfare Rights Organization, supra; Bowker v. Morton, supra.*[23]

■ The disposition of some of the claims presented in *Warth v. Seldin, supra,* indicates the proper application of this criterion where a plaintiff claims interference to the profitability of an on-going business. In *Warth,* two associations of housing contractors sought to challenge a zoning ordinance which barred construction of low-income housing. The Court held that one association had failed to "show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention" because it failed to refer to any project of its members with which the enforcement of the ordinance interfered at the time the lawsuit was commenced. 422 U.S. at 516, 95 S.Ct. 2197, 2214. The other association claimed by affidavit to represent " 'at least seventeen' groups that have been, are, or will be involved in the development of low- and moderate-cost housing," which groups allegedly

---

23. The *Linda R. S.* decision arose in the context of a criminal prosecution, a legal action with a "special status", 410 U.S. at 619, 93 S.Ct. 1146. Nonetheless, the basic holding involving the minimum necessary to satisfy the jurisdictional limitations on access to the federal courts is applicable in the context of a challenge to administrative action by federal agency. *Simon v. Eastern Kentucky Welfare Rights Org., supra; see* K. Davis, *Administrative Law of the Seventies* §§ 22.00, 22.02–6 (1976).

had been detrimentally affected by the challenged ordinance. The Supreme Court noted, however, that with one exception,[24]

> the complaint [did] not suggest that any of those groups ha[d] focused its efforts on Penfield or ha[d] any specific plan to do so. Again with the same exception, neither the complaint nor any materials of record indicate[d] that any member of Housing Council ha[d] taken any step toward building housing in Penfield, or ha[d] dealings of any nature with respondents.

422 U.S. at 516–17, 95 S.Ct. at 2214. Without further mention of the "non-excepted" association members, the Supreme Court found that this second association also lacked standing. It therefore appears that to establish standing to seek redress for an economic injury to a competitive interest, a plaintiff must demonstrate that within a reasonably proximate period prior to the commencement of the suit some action to further that competitive interest had been taken and had been interfered with, or that such action to be taken in the future was contemplated at that time.[25] Otherwise, there is no non-speculative basis to conclude that the grant of relief might actually improve the status of the claimant.

The proper application of the criteria requiring concrete, perceptible harm of a real, non-speculative nature is illustrated by the disposition in *California Bankers Association v. Shultz, supra,* 416 U.S. at 67–69, 94 S.Ct. 1494. Therein individual bank depositors and an association representing other bank depositors sought an injunction against enforcement of a regulation that required financial institutions to report each cash transaction involving more than $10,000. The individual depositors and the representative association claimed that this regulation contravened fourth amendment protections against unreasonable searches. The Court held, however, that they lacked standing, stating:

> We simply cannot assume that the mere fact that one is a depositor in a bank means that he has engaged or will engage in a transaction involving more than $10,000 in currency, which is the only type of domestic transaction which the Secretary's regulations require that the banks report. That being so, the depositor plaintiffs lack standing to challenge the domestic reporting regulations, since they do not show that their transactions are required to be reported.

416 U.S. at 68, 94 S.Ct. at 1521 (footnote omitted).

■ Absent a showing that the plaintiffs are within the class of persons whose interests are necessarily, or with substantial probability, affected by the challenged agency action, the nexus between allegedly illegal agency action and the interests of the claimants is too speculative, and therefore the statutory requirement that the plaintiff be "aggrieved" or "adversely affected" is not satisfied. Inclusion within such a class may not be inferred from facts indicating only potential inclusion, for that would improperly allow speculation and

---

**24.** The "exception" was Penfield Better Homes Corporation. Three years prior to the filing of the lawsuit, Better Homes had applied for a zoning variance which had been refused on the basis of the challenged ordinance. The Supreme Court found that, at the time of the application "or within a reasonable time thereafter, Better Homes itself and possibly Housing Council as its representative would have had standing to seek review of respondent's action. The complaint, however, does not allege that the Penfield Better Homes project remained viable" at the time the lawsuit was filed and therefore, facts indicating a live, concrete dispute had not been properly demonstrated. 422 U.S. at 517, 95 S.Ct. 2197, 2214.

**25.** MDNA has argued on appeal that the Supreme Court's determination in *Warth v. Sel-*

*din, supra,* is fully applicable only in assessing standing in a "non-statutory" case. Appellant's Brief at 15 n.19, citing 422 U.S. at 513–14, 95 S.Ct. 2197. This is not a valid interpretation of the Supreme Court's language which refers to the nature of the interest injured, not to the substantiality of the showing of injury. The *Warth* analysis has been unqualifiedly applied in several "statutory" cases challenging administrative acts under § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, the same provision on which MDNA has relied in bringing this suit. *See, e. g., Simon v. Eastern Kentucky Welfare Rights Org., supra,* 426 U.S. at 38, 96 S.Ct. 1917; *Bowker v. Morton, supra,* 541 F.2d at 1349; *A. O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 522 n.7 (3d Cir. 1976).

conjecture to serve as a basis for federal court jurisdiction. *See Golden v. Zwickler, supra; Metcalf v. National Petroleum Council,* 180 U.S.App.D.C. 31, 553 F.2d 176 (1977).

### B. Analysis of MDNA's Demonstration of "Injury in Fact"

In light of the foregoing discussion of the criteria of standing and of the Supreme Court's application of these criteria, we find MDNA's proffered demonstration of "injury in fact" inadequate.

#### 1. Injury to Interest in Selling to Lockheed

■ MDNA's first claim is that some members have in the past sold machinery to Lockheed and that during the foreseeable future Lockheed's needs for such machinery have been satisfied through the sale of Plant No. 14. Thereby, MDNA reasons, its members have been injured through the elimination of opportunities to profit through future sales to Lockheed.

We note, initially, that prior to the sale of Plant No. 14 the very machinery which Lockheed has now purchased subject to a five year use restriction was being operated by Lockheed for similar (if not the very same) purposes under authority granted by DOD.[26] MDNA's officers have testified, however, that the present conditional sale arrangement allows Lockheed less restricted use of the Plant No. 14 machinery for private uses than the pre-sale DOD contractual authorization. This less restricted use, they claim, has reduced Lockheed's need for machinery relative to the pre-sale arrangement.[27]

Assuming, as we must, that this claim is true,[28] it nevertheless does not demonstrate an injury any less speculative than that which proved insufficient in *Warth v. Seldin, supra.* MDNA does not refer to any existing relationship between Lockheed and one or more MDNA members which would require Lockheed to buy from them as opposed to buying from non-members.[29] We do not know from the record whether this type of machinery would have been available to Lockheed through MDNA members, and the mere rescission of the sale would not necessarily have made this machinery available to MDNA members through competitive bidding.[30] To find that MDNA members' interest in selling to Lockheed was injured by GSA's action would require us to assume (1) that Lockheed would seek to purchase similar machinery from private sources if the sale were rescinded and Lockheed continued to operate Plant No. 14 under DOD authorization; (2) that MDNA members would be among those private sources from which Lockheed would seek to obtain that machinery; and (3) that MDNA members would be able to supply Lockheed with such machinery. This conjectural chain of inferences is simply too speculative to support a finding that the claimed injury would be remedied through the grant of the requested relief of rescission of the sale. Therefore, standing to sue on this basis must be denied. *See Warth v. Seldin, supra; Linda R. S. v. Richard D., supra.*[31]

#### 2. Injury to Interest in Bidding for Plant No. 14

■ MDNA's second allegation of "injury in fact" relates to its members' interest in bidding competitively for the ma-

---

**26.** *See* note 2 *supra.*

**27.** *See, e. g.,* Deposition of Richard Studley (hereinafter Studley Depo.), at 127.

**28.** *See Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. 2197; *Metcalf v. National Petroleum Council, supra,* 180 U.S.App.D.C. at 44, 553 F.2d at 189 n.126.

**29.** *See, e. g.,* Deposition of Robert Tannen (hereinafter Tannen Depo.), at 52.

**30.** The machinery in Plant No. 14 is, according to one MDNA officer, substantially newer than

those machines which are generally available in the resale market and for these reasons are "select". In fact, he indicates that there is "virtually" no such machinery presently available for purchase by MDNA members. Studley Depo., at 134.

**31.** The Supreme Court's decision in *U. S. v. SCRAP, supra,* is not to the contrary. We are concerned here not with the length of the chain of causation, but on the plausibility of the links that comprise the chain. *Compare Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 260–64, 97 S.Ct. 555,

chinery in Plant No. 14. According to MDNA, "[m]any MDNA members would have attempted to purchase some of the property sold to Lockheed, and for some of such property would have paid more than Lockheed did." [32] It is not readily apparent, however, that any MDNA member of any group of members was actually in a position to bid for Plant No. 14 as a unit. Although the conditions that the Plant only be sold to Lockheed and that its defense production capacity be maintained may be legally suspect, it is clear that GSA could sell Plant No. 14 as a unit.[33] Nothing in the record indicates, and we will not assume, that GSA would sell the machinery on a piecemeal basis.

Therefore, in light of the holding in *Warth v. Seldin, supra,* MDNA may challenge the failure to advertise for competitive bidding only upon demonstration that its members presently participate in or contemplate participation in a viable business project which had adequate resources and an existent intent to purchase property such as Plant No. 14 as a whole. No such project or intent was alleged by MDNA in its complaint which claimed only that its members were interested in purchasing "some of the property sold to Lockheed." The depositions of MDNA's officers only raised the possibility that a group of members might organize and, with the possible involvement of unnamed real estate investors, might together have adequate resources to bid competitively for Plant No. 14 as a whole.[34] No details are given. Not

561–63, 50 L.Ed.2d 450 (1977), *with Warth v. Seldin, supra,* 422 U.S. at 516, 95 S.Ct. 2197.

**32.** Amended Complaint ¶ 5, J.A. at 10.

**33.** *See* 40 U.S.C. § 484(c):

Any executive agency designated or authorized by the Administrator to dispose of surplus property may do so by sale, exchange, lease, permit or transfer, for cash, credit or other property, with or without warranty, *and upon such other terms and conditions as the Administrator deems proper* . . . (emphasis added).

**34.** The strongest evidence presented by MDNA is included in the deposition of Richard Studley, the Executive Director of MDNA:

Q. Do you have any opinion or knowledge or any basis for believing that any member of your Association or even a group of them would have been interested in bidding on the entire plant, had the entire plant been offered by the government for public sale?
A. Yes, I—I think with my knowledge of the way the industry operates, that a bid would have been made

. . . . .

Q. And you believe the members of your Association would have been willing to bid on the entire plant in this area of that sum [for which the plant was sold]?
A. I believe that members of my association would have been involved in a sale of that size. *Now, I am not restricting that to members, but I would say that between members and other, say, possibly real estate companies who are not members—real estate developers—*

Q. *Not members of your Association?*
A. *Oh, well, yes—it is possible.* It is possible that a company like Rouse who is a member and a company by the name of Milton J. Wershaw Co. of Los Angeles would have that capability.
Studley Depo., at 130–31 (emphasis added).

This testimony must be read in light of the testimony of Robert Tannen, General Manager of MDNA, and Sidney Mandell, then President of MDNA:

Q. . . . Can you tell me now the name of any member or members of the Association whom you believe would have paid more for any item sold to Lockheed by the Government than Lockheed paid?
A. Yes, Mr. Mandell . . . .
Q. *So to your knowledge, Mr. Mandell is the only member* you could state at this time has ever said he would pay more for machinery than Lockheed?
A. *He is the only one I can recall right now who specifically referred to that question,* but here again I am sure that were you to question specific individuals with regard to the price for the machines quoted you would probably have a number saying they would have paid more for it.
Q. Again, that is a supposition.
A. *That is a supposition on my part.*
Tannen Depo., at 50–51 (emphasis added).

Q. So I take it then, Mr. Mandell, from what you are saying that the statement in paragraph five of the Amended Complaint that many members would have attempted to purchase some of the property and for some of the property would have paid more than Lockheed is based on a number of assump-

even one MDNA member possessing or participating in a group which possessed both adequate assets and an existent intent to bid effectively on Plant No. 14 is identified. Therefore, we hold that MDNA has failed to demonstrate that any of its members come within a class whose injuries caused by GSA's failure to advertise this sale for competitive bidding are of "sufficient immediacy and ripeness to warrant judicial intervention." *Warth v. Seldin, supra,* 422 U.S. at 516, 95 S.Ct. at 2214; *California Bankers Ass'n v. Shultz, supra,* 416 U.S. at 67–69, 94 S.Ct. 1494.

### 3. *Injury Through Increased Competition*

■ Although not alleged in its complaint nor referred to by the district court in its memorandum and order of dismissal, MDNA claims a third "injury in fact" on appeal.[35] Relying solely on the deposition testimony of one of its officers [36] which indicates that Lockheed has placed some of the machinery from Plant No. 14 up for auction, MDNA argues that the challenged sale has resulted in increased competition for its members, an injury which they claim is analogous to that which the Supreme Court found adequate to support standing in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

The lone evidence of this claimed resale of the machinery in Plant No. 14 is a flyer, distributed by an MDNA member, announcing an auction of machinery which lists some of the machinery obtained by Lockheed through the challenged sale.[37] There is no suggestion in the record, however, that Lockheed regularly competes with MDNA members in the machinery resale market or that in the normal course of business Lockheed periodically makes such sales. All that is indicated is that in November 1973 Lockheed tried to resell some machinery obtained through the purchase

---

tions. One of the assumptions would be that the property was sold on an *item-by-item* basis by advertising?

A. That's usually the way the Government sells equipment.

Q. *Right, but you are not capable, I gather at this time, I* [sic] *saying definitely whether, had your member bid on this entire plant in its entirety as a unit that any of the members would have bid more than Lockheed did?*

A. *I can't say for sure.* I don't know what Lockheed bid. . . .

Q. If I were to tell you the entire plant including buildings, real estate, the machinery, hand tools everything there that the Government owned were [sic] sold to Lockheed by the Government by negotiation for a price in excess of $30 million, do you have any way of making an estimate whether your Association and its members would have bid more, less?

A. That I don't know.

Q. *Do you know of any purchases by any group of members of your Association in the range of $30 million?*

A. *I don't know.* . . .

Mandell Depo., at 77–79 (emphasis added). Even when read as favorably to MDNA as is reasonable, this testimony does not demonstrate any non-speculative basis for finding that a viable syndicate existed or was contemplated by MDNA members.

**35.** MDNA thus seeks to establish jurisdiction by allegations relating to a claim which is not included in its complaint. Under Fed.R.Civ.P. 8(a), a plaintiff is required to include in his complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." One such ground is the existence of a specific, concrete and particularized injury in fact which must be alleged. *Ass'n of Data Processing Service Org., Inc. v. Camp, supra,* 397 U.S. at 152, 90 S.Ct. 827. Despite consciously amending the complaint to include MDNA for the single purpose of assuring the involvement of a claimant which might establish standing as a competitor, the plaintiffs failed to specify this claimed "injury in fact" and apparently did not press this claim in the district court. The opinion of the district court refers only to the two injuries discussed previously, and in its briefs and oral argument before this court, MDNA has not directly challenged this two-fold characterization of the claimed "injury in fact".

At least one recent decision indicates, however, that an appellate court can go beyond the allegations included in the pleadings to identify from the record any other injuries which might meet the Article III standard for standing. *Urban Contrs. Alliance v. Bi-State Develop. Agency,* 531 F.2d 877, 880 n.3 (8th Cir. 1976). We therefore reluctantly undertake analysis of this third claimed "injury in fact."

**36.** Studley Depo., at 63–67.

**37.** *See* Studley Depo., Exhibit 7.

of Plant No. 14.[38] On this showing alone MDNA cannot claim that its members are immediately threatened with future injury of sufficient immediacy and ripeness to warrant judicial intervention. *Warth v. Seldin, supra,* 422 U.S. at 516, 95 S.Ct. 2197; *see, e. g., O'Shea v. Littleton, supra,* 414 U.S. at 494, 94 S.Ct. 669; *Metcalf v. National Petroleum Council, supra,* 180 U.S.App. D.C. at 41–42, 553 F.2d at 186–87.

Additionally, MDNA has not demonstrated that the November 1973 auction actually resulted in an injury to its members through increased competition. The record does not disclose who received notice of this auction other than MDNA's members, nor who bid on the machinery.[39] Therefore, there is no non-speculative basis for finding that Lockheed actually sold or attempted to sell Plant No. 14 machinery to the same class of buyers to whom MDNA members would sell or attempt to sell. MDNA has failed to demonstrate that the challenged sale actually resulted in increased competition in the past or threatens to increase competition in the immediate future;

therefore, this claim of "injury in fact" will not support federal court jurisdiction.[40]

## CONCLUSION

There being no demonstration on the part of MDNA which adequately indicates that one or more of its members could have established that the sale of Plant No. 14 resulted in an "injury in fact" to their interests *qua* members of MDNA, MDNA lacks standing to challenge the sale. For this reason, the district court's dismissal of the action is

*Affirmed.*

38. We do not know whether, at the time of the auction, Lockheed still owned the machinery or had transferred ownership to the MDNA member. Reading the record most favorably to MDNA, however, we assume that Lockheed still owned the machinery and was merely dealing through the MDNA member.

39. In noting MDNA's failure to provide this information, we do not suggest that a plaintiff may be required to support a claim through production of evidence outside his control. To the contrary, an MDNA officer stated that the identity of the successful purchasers, if not all bidders, should be available to MDNA from the member firm which handled the auction. Studley Depo., at 116. Nonetheless, the record is completely silent as to the identity of invited bidders and successful purchasers.

40. This showing of "injury of fact" must be compared with that which the Supreme Court found adequate to support standing in *Ass'n of Data Processing Service Org., Inc. v. Camp, supra,* 397 U.S. at 152, 90 S.Ct. 827, wherein the petitioners claimed that the defendant was competing or preparing to compete with them in the computer service market. The failure of MDNA to demonstrate a factual basis for similar claims that Lockheed competed or is pre-

pared to compete with them in the machinery resale market distinguishes these two cases and requires a different result here.

MDNA has not included a request for damages in its complaint. Injury from increased competition could be the source of such a claim, however, and we note that with respect to that issue the Supreme Court has just about said it all in *Warth v. Seldin, supra:*

. . . Home Builders alleges no monetary injury to itself, nor any assignment of the damages claims of its members. No award therefore can be made to the association as such. Moreover, in the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof. Thus, to obtain relief in damages, each member of Home Builders who claims injury as a result of respondents' practices must be a party to the suit, and Home Builders has no standing to claim damages in his behalf.

422 U.S. at 515, 95 S.Ct. at 2214.