LEBOEUF, LAMB, GREENE & MACRAE, LLP, Plaintiff,

v.

Spencer ABRAHAM, Secretary of Energy, and United States Department of Energy, Defendants,

and

Winston & Strawn, Intervenor Defendant.

Civ.A. No. 01–269(RMU).

United States District Court, District of Columbia.

May 17, 2001.

Eugene R. Fidell, James Feldesman, Khatereh S. Ghiladi, Feldesman, Tucker, Leifer, Fidell & Bank, LLP, Robert Kenly Webster, Steven H. Wishod, Washington, DC, for plaintiff.

Kenneth S. Kessler, U.S. Department of Justice, Civil Division, Thomas Paul Humphrey, II, James Jennings Regan, Crowell & Moring, L.L.P., Washington, DC, for defendants.

Marta A. Adams, Attorney General for the State of Nevada, Carson City, NV, amicus.

### *MEMORANDUM OPINION*

URBINA, District Judge.

**Denying the State of Nevada's Motion to Intervene; Granting the State of Nevada· Permission to Participate as *Amicus Curiae***

## I. INTRODUCTION

Ninety miles northwest of Las Vegas, extending six miles north to south, Yucca Mountain rises over the Amargosa Desert like an ocean crest. Formed by ancient volcanic eruptions, Yucca Mountain resembles a ridge more than a mountain, reaching heights of just 1,200 feet above sea level. This barren volcanic ridge straddles the

southwestern perimeter of the Nevada Test Site, where the United States has detonated more than 900 bombs since 1950, when President Truman designated Nevada as the nation's continental site for testing nuclear weapons. Now, more than fifty years after the detonation of the first bomb, the United States is poised to recreate a nuclear landscape in Nevada. In one of the largest government projects in the history of the United States, Congress has selected Yucca Mountain as the burial site for thousands of tons of high-level radioactive waste and spent nuclear fuel.

This litigation does not deal with the suitability of burying nuclear waste in Yucca Mountain per se. Rather, it involves allegations of bias and conflicts-of-interest between the reviewing law firm of the Yucca Mountain Project and a subcontractor creating scientific studies about the Project. The plaintiff, the law firm of LeBoeuf, Lamb, Greene & MacRae, LLP ("LeBoeuf"), alleges that the Department of Energy ("DOE") acted in an arbitrary, capricious, and illegal manner by awarding a legal-services contract to the law firm of Winston & Strawn ("Winston"). *See* Mot. for Prelim.Inj. at 1. According to LeBoeuf, Winston's representation of two DOE contractors, including DOE's prime contractor, TRW Environmental Safety Systems, Inc. ("TRW"), created an impermissible conflict of interest that should have disqualified Winston from the bidding. *See id.* LeBoeuf and Winston were the only bidders for this work, and both received a perfect score from DOE. *See id.*

LeBoeuf began this litigation on March 27, 2000 in the District of Nevada, seeking to preliminarily enjoin Winston's performance of the contract. Thereafter, Winston moved to intervene in the matter, as did the State of Nevada, through its Agency for Nuclear Projects ("State" or "Nevada"). The Nevada court granted Winston's motion to intervene but, for reasons that are unclear, did not rule on Nevada's motion to intervene or on Le-Boeuf's motion for a preliminary injunction. On February 3, 2001, more than ten months after the case was filed, the Nevada court transferred the case to this court, with Le-Bouef's motion for preliminary injunction and

Nevada's motion to intervene still pending. The sole purpose of this opinion is to resolve Nevada's motion to intervene. For the reasons that follow, the court will deny Nevada's motion to intervene. The court, however, will allow Nevada to participate in this matter as an *amicus curiae*.

## II. BACKGROUND

### A. Nevada's Motion to Intervene

On May 9, 2000, the State of Nevada, through its Agency for Nuclear Projects, moved to intervene as a plaintiff in this case. Under its state law, Nevada has a statutory mandate to represent the people of Nevada in all matters related to the Yucca Mountain Project. *See* Nev. Revised Statutes ("NRS") §§ 459.0093–459.0098. Nevada also has federal statutory rights to participate in certain decisions relating to the repository. For example, Nevada has the right to veto any presidential decision to proceed with repository development, subject to congressional override. *See* 42 U.S.C. § 10135. Nevada also has the right to participate as an interested state in licensing proceedings before the Nuclear Regulatory Commission ("NRC"). *See id.* § 2021(l).

In support of its motion to intervene, Nevada argues that a conflict of interest between Winston and TRW could jeopardize objective, independent review of the Yucca Mountain Project before the NRC. *See* Mot. to Intervene at 3. According to Nevada, "[i]mproper siting, construction and operation of the repository pose undeniable threats to Nevada's fragile desert environment and its resources, its tourist-based economy, its tax base from loss of revenues and the general health and safety of its citizens for thousands of years." *Id.* at 4. Nevada further argues that because it will be "a key participant" in NRC licensing proceedings, and because it has federal rights to participate in decisions that relate to the repository, it has a significant public interest in the subject matter of this case, and therefore should be permitted to intervene. *See id.*

LeBoeuf agrees that Nevada needs to participate in this case to protect its interest in the conflict issues. *See* Pl.'s Response to

Nevada Mot. to Intervene ¶ 4. By contrast, both DOE and Winston oppose Nevada's motion to intervene. They define the subject of this litigation narrowly—as a bid protest action—in which, they contend, Nevada has no significant protectable interest. For example, DOE argues that "the Yucca Mountain Project is *not* the subject of this lawsuit ... LeBouef's complaint has nothing to do with the 'operation and construction' of the Yucca Mountain project, or the 'fairness of future licensing proceedings' before the [NRC]." DOE Opp'n to Mot. to Intervene at 2. For similar reasons, DOE and Winston contend that Nevada lacks Article III standing to intervene in this matter.

Although Nevada's motion to intervene is the only matter now before the court, an overview of the statutory and procedural framework of the Yucca Mountain Project may assist in understanding the current conflict. Accordingly, the court will begin with a brief discussion of the storage of nuclear waste, the Nuclear Waste Policy Act, and the procurement at issue. The court will then address whether Nevada has standing to intervene in this action and whether Nevada meets the requirements for intervention under Federal Rules of Civil Procedure 24(a) and (b).

## B. The Yucca Mountain Project

### 1. *The Nuclear Waste Policy Act*[1]

Nuclear fuel begins as uranium, a naturally occurring radioactive material. The uranium—molded into solid ceramic pellets—is sealed in metal tubes and bundled together to form what is known as a nuclear fuel assembly. The fuel assembly is then placed inside a nuclear reactor, where the uranium atoms split apart (or fission), and in the process, generate energy. With time, however, the concentration of fission fragments in a fuel bundle increases to the point where the fuel becomes inefficient. When this happens, the used—or "spent"—fuel must be removed from the reactor and replaced with fresh fuel. The spent fuel is highly radioactive and comprises the primary form of high-level radioactive waste.

Once removed from the reactor, spent fuel requires special storage because it continues to emit radiation until it reaches a stable form, a process that can take thousands of years. Currently, most spent fuel is stored in concrete basins of water, which cool the fuel, or in steel or concrete containers called "dry casks." The DOE estimates that there are more than 42,000 metric tons of spent fuel stored in basins and dry casks throughout the country. These storage methods are only temporary resting sites, however, and many are nearing or are at capacity.

In 1982, faced with growing concern about storage of nuclear waste, Congress passed the Nuclear Waste Policy Act, 42 U.S.C. § 10101 *et seq.* ("NWPA"), directing the federal government to dispose permanently of spent nuclear fuel and high-level radioactive waste. Under the NWPA, utility companies that own nuclear generators will pay the DOE for the cost of disposing of their spent nuclear fuel. In turn, the DOE will be responsible for siting, building, and operating a repository. Congress originally instructed the DOE to "characterize" several sites for disposal of the waste.[2] In 1987, however, to the consternation of many Nevadans, Congress amended the NWPA to designate Yucca Mountain as the only site for characterization. *See* Nuclear Waste Policy Amendments Act of 1987, 42 U.S.C. § 10172.[3]

---

1. The background information on nuclear waste appears on a DOE website devoted to the Yucca Mountain Project, *see* <http://www.ymp.gov/factsheets/doeymp0338.htm>, and on the DOE's National Spent Nuclear Fuel Program website, *see* <http://www.nsnfp.inel.gov>.

2. As described in the NWPA, the process of "site characterization" includes "activities ... undertaken to establish the geologic condition ... of a candidate site ... including borings, surface excavations, excavations of exploratory shafts, lim-

ited subsurface lateral excavations and borings, and in situ testing needed to evaluate the suitability of a candidate site for the location of a repository." 42 U.S.C. § 10101(21)(A) and (B).

3. The Amendments explicitly state that if during the site characterization work the Secretary determines that Yucca Mountain is unsuitable for development as a repository, he shall terminate those activities and, within six months, provide recommendations on further action to Congress. *See* 42 U.S.C. § 10133(c)(3)(A)–(F).

Before a repository becomes operational, the DOE must follow a unique set of procedures contained in the NWPA. *See* 42 U.S.C. §§ 10134–35. For example, the DOE must hold "public hearings in the vicinity of the Yucca Mountain site" and recommend a site for the repository to the President. *See id.* § 10134(a)(1). The President must then recommend the site to Congress. *See id.* at § 10134(a)(2). Finally, the NRC must review and approve a License Application for the repository, submitted by the DOE. *See id.* § 10134(b)–(d). States, local governments, and Indian tribes, along with other members of the public, may participate as parties in the NRC licensing proceeding for the Yucca Mountain Project.

In addition, and of particular importance to the present matter, the DOE must contract with an independent legal advisor in areas where it lacks expertise. *See* 10 C.F.R. § 60.10. Thus, because the DOE lacks expertise in NRC licensing, it must retain an outside law firm to provide advice and assistance in developing an NRC license application, reviewing drafts of the application, and representing the DOE before the NRC. *See* Am.Compl. ¶ 6. As discussed below, the present litigation concerns DOE's retention of Winston & Strawn as its independent legal advisor in these matters.

### 2. *The Subject Procurement*

On May 27, 1999, the DOE issued a Request for Proposals and Solicitation ("RFP"), seeking "professional legal advice and assistance to the DOE, Office of General Counsel, involving legal matters related to the licensing activities of the DOE's OCRWM [Office of Civilian Radioactive Waste Management] for Yucca Mountain." *See* Am.Compl. ¶ 26. The RFP stated the general requirements as follows:

> the contractor will provide support to DOE in performing activities necessary to the preparation and defense of a potential license application for a spent nuclear fuel and high-level radioactive waste repository at the Yucca Mountain, Nevada site.... The Contractor will be required to work with DOE and its contractor(s) in a Teaming arrangement in order to perform some work under this contract.

*Id.* The RFP explained that a "Teaming arrangement" involves close coordination of work effort between the contractor, DOE, and other DOE contractors. *See id.*

As LeBoeuf notes in its amended complaint, the RFP also incorporated one of the DOE's Acquisition Regulations relating to organizational conflicts of interest "to ensure that the contractor is not biased because of its financial, contractual, organizational or other interests which relate to work under the contract." *Id.* ¶ 27 (citing DEAR § 952.209–72). Section K.5 of the RFP required any successful offeror to provide "a disclosure statement of any past, present, or currently planned financial, contractual, organizational or other interests relating to the performance of the statement of work." *Id.* In accordance with this requirement, Winston submitted information about its contract with TRW to the DOE. Specifically, Winston explained that TRW had contracted with DOE in 1991 to provide services as a Management and Operating ("M & O") contractor and to "support DOE in performing activities necessary to ensure compliance with regulatory requirements and prepare the license [application] for the repository." *See id.* ¶¶ 16–17. In 1992, TRW subcontracted Winston "to ensure that TRW is performing in accordance with NRC regulations, guidelines, etc." *See* Mot. for Prelim.Inj. at 5 (citing 1992 Letter from TRW, Ex. A).

Before signing the contract with Winston, TRW advised Winston and other bidders that "Firm(s) providing technical support services to TRW based upon [this] RFP ... will be disqualified from bidding on the procurement [contract that the DOE Office of General Counsel] intends to publish in the future," *i.e.*, the contract that is the subject of the instant litigation. *See* Am.Compl. ¶ 19. TRW further stated that "firms selected by TRW will provide services exclusive[ly] to TRW, and not to OCRWM, since [the DOE Office of General Counsel] is the exclusive advisor to OCRWM." *Id.*

On September 20, 1999, LeBoeuf learned that the DOE had awarded Winston the Yucca Mountain contract. *See id.* ¶ 36. The DOE informed LeBoeuf that although both

firms had scored 1,000 points out of a possible 1,000, Winston had offered a lower price for its bid. *See id.* On October 4, 1999, LeBoeuf filed a protest with the U.S. General Accounting Office ("GAO"). LeBoeuf argued that Winston should have been disqualified from the procurement because its work for TRW rendered it incapable of providing impartial and objective advice to the DOE. *See id.* ¶ 38. The GAO denied LeBoeuf's protest on the ground that "the work contemplated by the protested contract is essentially a continuation of the work Winston and Strawn previously accomplished under its TRW subcontract." Def.'s Opp'n to Mot. to Intervene, Ex. 11(b) at 8. The GAO did not address any of LeBoeuf's ethical complaints, stating that it "lacked jurisdiction to review alleged violations of these rules [applicable canons of ethics or rules of professional responsibility]." *Id.* at 9 n. 7. Thereafter, LeBoeuf brought suit in the U.S. District Court for the District of Nevada, which then transferred the case to this court.

## III. DISCUSSION

### A. Legal Standard

■ The Federal Rules of Civil Procedure provide two mechanisms for third-party intervention in a lawsuit: intervention of right under Rule 24(a), and permissive intervention under Rule 24(b). *See* FED.R.CIV.P. 24(a) and (b). A motion to intervene of right turns on the movant's ability to demonstrate that: (1) the motion is timely; (2) the movant claims an interest relating to the property or transaction which is the subject of the action; (3) the movant is so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the movant's interest is not adequately represented by the existing parties. *See* FED.R.CIV.P. 24(a)(2); *Mylan v. Henney,* 94 F.Supp.2d 36, 44 (D.D.C.2000) (Urbina, J.) (citing *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1074 (D.C.Cir.1998)). In this Circuit, "[a] general legal interest in a pending suit does not satisfy the requirements of rule 24(a)." *Alaska Excursion*

Cruises, Inc. v. United States, 603 F.Supp. 541, 551 (D.D.C.1984).

■ By contrast, permissive intervention turns on the movant's ability to show: (1) an independent ground for subject-matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action. *See* FED. R.CIV.P. 24(b)(2); *EEOC v. National Children's Ctr., Inc.,* 146 F.3d 1042, 1046 (D.C.Cir.1998). "As its name would suggest, permissive intervention is an inherently discretionary enterprise." *Id.* at 1045. To that end, Rule 24(b) provides that "[i]n exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." FED.R.CIV.P. 24(b).

■ Although courts in this circuit generally take a liberal approach to intervention, *see, e.g., Wilderness Soc'y v. Babbitt,* 104 F.Supp.2d 10, 11, 18 (D.D.C.2000), they do require that an applicant seeking to intervene of right have standing to participate in the action.[4] *See Mova Pharm. Corp.,* 140 F.3d at 1074; *Cleveland v. NRC,* 17 F.3d 1515, 1517 (D.C.Cir.1994) *(per curiam).* Thus, as a threshold matter, the court must address whether Nevada has standing to intervene of right.

### B. Does the State of Nevada Have Standing to Intervene of Right?

#### 1. *Constitutional and Prudential Requirements*

To establish standing under Article III of the U.S. Constitution, a party must allege an actual "case or controversy." *See* U.S. Const. art. III. The Supreme Court has framed the law of standing as a narrow, three-part test:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural or hypothetical'." Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be "fairly ... trace[able]

4. In this Circuit, it is unclear whether standing is necessary for permissive intervention. *See In re*

*Vitamins Antitrust Class Actions,* 215 F.3d 26, 31 (D.C.Cir.2000).

to the challenged action of the defendant...." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted); *see also Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997); *Northeastern Florida Contractors v. Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

▉ In addition to the constitutional requirements for standing, potential intervenors must also demonstrate that they have "prudential" standing to sue. *See Mova*, 140 F.3d at 1074–76. The prudential rules of standing serve to limit the role of courts in resolving public disputes. *See Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Thus, for example, the litigant must allege that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).[5] The litigant also must show that his complaint is not a "generalized grievance shared in substantially equal measure by all or a large class of citizens." *See Warth*, 422 U.S. at 499, 95 S.Ct. 2197 (citations omitted).

Despite these carefully enumerated requirements, many commentators have observed that the modern law of standing is imbued with a high degree of doctrinal manipulation. *See, e.g.*, Richard J. Pierce, Jr., *Is Standing Law or Politics?*, 77 N.C.L.REV. 1741, 1744 (1999). Indeed, the injury-in-fact requirement has proved particularly unwieldy. For example, if the court were to frame this case as a straightforward bid-protest dispute, Nevada's injury-in-fact would appear quite attenuated. Nevada would suffer an "actual or imminent" injury only if the DOE recommended Yucca Mountain to Congress and the President, Congress overrode any

vetoes from Nevada or Indian tribes, the DOE applied for a license from the NRC, the OCRWM verified that DOE had met all the quality assurance and safety standards, *and* the United States ultimately constructed the waste repository in Yucca Mountain, would Nevada suffer an "actual or imminent" injury. In effect, Nevada would have to prove that if there were a conflict of interest between Winston & TRW, this conflict would skew the licensing proceedings before the NRC and lead to improper siting of the repository in Nevada. Viewed from this perspective, Nevada's injury-in-fact is hypothetical at best.

On the other hand, if the court were to frame this case as a dispute over the public health and safety of Nevadans, the State would have a much stronger case for standing. Under the NWPA, the DOE is required to perform an independent review of the suitability of the site and repository design before recommending the site to the President and submitting a license application to the NRC. To the extent that DOE's selection of Winston would compromise this independent review and lead to improper siting of the repository, Nevada would stand to incur injury. As Nevada explains: "If Winston is unable, due to its alleged conflicts of interests, to perform the required independent legal review of the license application, the very real possibility exists that critical health and safety components of the application will be overlooked or fail to be identified." Reply at 4.

### 2. *Prudential Analysis*

▉ How, then, is the court to frame Nevada's injury-in-fact? Fortunately, the court need not reach this question, because Nevada fails to show that it is within the zone-of-interests of the relevant statutory scheme. *Cf. Public Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 714 (D.C.Cir.1977) ("if the plaintiff fails the statutory test of showing the challenged action has adversely affected him," the court need not address whether the

---

5. There is a strong argument that the zone-of-interests test applies only to plaintiffs seeking review of agency decisions under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* ("APA"). *See Clarke*, 479 U.S. at 400 n. 16, 107

S.Ct. 750 ("The principal cases in which the 'zone of interest' test has been applied are those involving claims under the APA, and the test is most usefully understood as a gloss on the meaning of § 702").

alleged injury meets the Article III requirements for standing). In other words, because Nevada cannot show that it has prudential standing to intervene in this case, the court need not address whether it has constitutional standing.

■ Nevada seeks review under section 10(a) of the APA, 5 U.S.C. § 702. *See* Reply at 3; Proposed Compl. ¶ 10. Accordingly, Nevada must establish that it has "prudential standing" by showing that its interests are "arguably within the zone of interests to be protected or regulated by the statute ... in question." *See Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense,* 87 F.3d 1356, 1359 (D.C.Cir.1996). A party may demonstrate this in one of two ways: "if it is among those [who] Congress expressly indicated were the intended beneficiaries of a statute," *Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918, 922 (D.C.Cir. 1989), or if it is a "suitable challenger" to enforce the statute, i.e., if its "interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not 'more likely to frustrate than to further ... statutory objectives,'" *First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.,* 988 F.2d 1272, 1275 (citations omitted).

Under what statute does Nevada claim protection? With respect to this question, Nevada's proposed complaint is telling. Nevada alleges that this court has jurisdiction under the APA, but does not say how it was aggrieved "within the meaning of a relevant statute." *See* 5 U.S.C. § 702. Nevada does not allege that DOE violated the NWPA, or that DOE's selection of counsel will obstruct Nevada's right to participate in the NRC licensing proceeding. Indeed, in Nevada's prayer for relief, Nevada asks only that it be granted the right to intervene, not that the court redress any injury caused by agency action. *See* Proposed Compl. ¶¶ 19–23.

■ For its part, LeBoeuf premises jurisdiction on the 1996 amendments to the Tucker Act, 28 U.S.C. § 1391(b), and the APA, 5

U.S.C. § 702, combined with general federal question jurisdiction under 28 U.S.C. § 1331. The Tucker Act provides that district courts "shall have jurisdiction to render judgment in an action by an *interested party* objecting to ... a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1391(b)(1) (emphasis added).

Assuming *arguendo* that Nevada purports to intervene under the Tucker Act,[6] Nevada must demonstrate that it was an "interested party." Although the Tucker Act does not define the term "interested party," the Ninth Circuit and other courts have defined "interested party" according to the definition set forth in the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551(2). *See, e.g., Brem–Air Disposal v. Cohen,* 156 F.3d 1002 (9th Cir.1998); *Waste Mgt. of North Am., Inc. v. Weinberger,* 862 F.2d 1393 (9th Cir. 1988); *Anderson Columbia Envtl., Inc. v. United States,* 42 Fed.Cl. 880, 884 (Fed.Cl. 1999). That statute defines an "interested party" as an "actual or prospective bidder or offeror" whose "direct economic interest" would be affected by the award of the contract or by failure to award the contract. *See* 31 U.S.C. § 3551(2). Nevada was not an "interested party" because it was not an "actual or prospective bidder or offeror" in the subject procurement. Thus, Nevada cannot show that it is within the "zone of interests" of the Tucker Act.

Accordingly, because Nevada does not having standing to intervene in this action, it is not entitled to intervene as a matter of right under Rule 24(a).

### C. Is the State of Nevada Entitled to Permissive Intervention?

■ Just as Nevada fails to allege which statute it seeks to enforce or under which statute it was aggrieved, Nevada fails to identify an independent ground for jurisdiction, as required by the federal rule on per-

---

6. Nevada claims that it does *not* purport to intervene under the Tucker Act—the statute under which LeBoeuf seeks review—but rather under Federal Rule of Civil Procedure 24. *See* Reply at 2. Rule 24, however, is not an independent grant

of subject-matter jurisdiction. *See* Fed.R.Civ.P. 82 ("These rules shall not be construed to extend or limit the jurisdiction of the United States district courts...").

missive intervention. *See* FED.R.CIV.P. 24(b). Nevada also fails to allege that its claim shares common questions of law or fact with those raised by LeBoeuf, another requirement for permissive intervention. *See id.* In fact, it is not clear what Nevada's claim is, and Nevada does not state any claim for relief in its proposed complaint. Accordingly, the court concludes that Nevada is not entitled to permissive intervention under Rule 24(b).

### D. Participation as *Amicus Curiae*

Although Nevada is not entitled to intervene in this case, either permissively or of right, the court will allow Nevada to participate as *amicus curiae.* Thus, Nevada may, without the court's prior consent, file briefs responsive to dispositive motions or to other major motions. *Cf. Anderson*, 42 Fed.Cl. at 885 (denying contract awardee's motion to intervene of right and by permission, but allowing awardee to participate as *amicus curiae*); *Planned Parenthood v. American Coalition of Life Activists*, 244 F.3d 1007, 1014 n. 6 (9th Cir.2001) (construing motion to intervene as motion to participate as *amicus curiae*); *Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1225 (6th Cir.1975) (affirming district court's denial of the Ohio Civil Rights Commission's motion for permissive intervention, noting that if "the Commission accepts the District Court's invitation to participate in the litigation as an amicus curiae," it would "afford the Commission ample opportunity to give the court the benefit of its expertise," and noting that "the District Court apparently will receive and consider any admissible evidence that the Commission chooses to offer").

As *amicus,* Nevada may also appear at all public hearings and proceedings, and the court may request Nevada's views. *See Anderson*, 42 Fed.Cl. at 885. If both parties consent, Nevada may be present at depositions or other discovery proceedings. *See id.* As to all other activities, however, Nevada must obtain the court's prior consent. *See id.* These activities include: (1) filing initial motions; (2) taking discovery or participating in discovery of any party; or (3) attending or participating in settlement discussions. *See id.*

### IV. CONCLUSION

For the reasons stated above, the court will deny the State of Nevada's motion to intervene of right, or alternatively, by permission. However, the court will allow the State to participate in this matter as *amicus curiae.* An Order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously executed this _____ day of May 2001.

