SHELL OIL COMPANY OF CANADA, LIMITED, *v.* UNITED STATES (No. 4192)[1]

United States Court of Customs and Patent Appeals, October 30, 1939

*Thompson, Hine & Flory (James A. Weeks* of counsel) for appellant.

*Webster J. Oliver,* Assistant Attorney General (*Charles D. Lawrence,* Special Assistant to the Attorney General, and *William J. Vitale,* special attorney, of counsel), for the United States.

*James H. Hayes, amicus curiae.*

[Oral argument October 2, 1939, by Mr. Weeks, Mr Hayes, and Mr. Lawrence]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, Brown, J., dissenting, overruling the protest by

[1] C. A. D. 68.

which appellant brought suit to recover monies assessed and collected by the Collector of Customs at the port of Cleveland, Ohio, upon a petroleum material, hereinafter more particularly described. It seems to have been invoiced as "Cracking still residue."

It is shown by the record that appellant, a Canadian corporation, is engaged in the business of refining and marketing oil and gasoline. Between November 5, 1935, and September 9, 1936, it purchased large quantities of crude petroleum in the condition as it came from wells located in Texas and Louisiana and exported it to its plant at Montreal, Canada, where it underwent what is designated a "cracking process" by means of which gasoline was extracted, and a residue, described by the appraiser as "liquid petroleum residue from crude petroleum," remained. About 81,000 barrels of this residue were imported into the United States through the port of Cleveland, Ohio, on dates ranging from July 28, 1936, to October 10, 1936, and entered (as shown by one of the typical consumption entries) as "American Goods Ret'd Cracking still residue from native American crude."

The merchandise was classified by the collector under paragraph 1733 of the Tariff Act of 1930 and held free of duty, so far as that act was concerned, but was assessed with a tax, the equivalent of a customs duty, at the rate of one-half cent per gallon pursuant to the provisions of section 601 (c) (4) of the Revenue Act of 1932.

Appellant protested, the substance of its claim being epitomized in its brief as follows:

* * * that the merchandise should have been classified as "American Goods Returned" under Section 201, Paragraph 1615 of the Tariff Act of 1930 and admitted free of all tariff duties and free of any excise tax levied under Section 601 (c) 4 of the Revenue Act of 1932.

The portions of the involved statutes pertinent to the issue read:
Paragraph 1733, Tariff Act of 1930 [Free List]:

Oils, mineral: Petroleum, crude, fuel, or refined, and all distillates obtained from petroleum, including kerosene, benzine, naphtha, gasoline, paraffin, and paraffin oil, not specially provided for.

Section 601, Revenue Act of 1932:

(a) In addition to any other tax or duty imposed by law, there shall be imposed a tax as provided in subsection (c) on every article imported into the United States unless treaty provisions of the United States otherwise provide.

(b) The tax imposed under subsection (a) shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act, * * *.

(c) There is hereby imposed upon the following articles sold in the United States by the manufacturer or producer, or imported into the United States, a tax at the rates hereinafter set forth, to be paid by the manufacturer, producer, or importer: * * *

(4) Crude petroleum, $\frac{1}{2}$ cent per gallon; fuel oil derived from petroleum, gas oil derived from petroleum, and all liquid derivatives of crude petroleum, except

lubricating oil and gasoline or other motor fuel, ½ cent per gallon; * * *. The tax on the articles described in this paragraph shall apply only with respect to the importation of such articles.

Paragraph 1615, Tariff Act of 1930:

Articles the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means if imported by or for the account of the person who exported them from the United States; * * * but proof of the identity of such articles shall be made, under general regulations to be prescribed by the Secretary of the Treasury, * * * and if any such articles are subject to internal-revenue tax at the time of exportation, such tax shall be proved to have been paid before exportation and not refunded; * * *.

It may be said at the outset that in the case of *Maple Leaf Petroleum, Ltd.,* v. *United States,* 25 C. C. P. A. (Customs) 5, T. D. 48976, the appellant there sought adjudication of an issue similar in many respects to that here involved, but we did not there pass upon the merits of the case because we found there had not been a compliance with the regulations (Article 392, Customs Regulations 1931) relating to the return of goods under paragraph 1615, *supra.*

In the instant case the trial court found that there had been substantial compliance with the regulations. We agree with this finding and it is not questioned that the imported material was a constituent part of the material which was exported. Identity, in that respect, is satisfactorily established.

That the tax imposed was in the nature of a customs duty "levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930," and that it requires treatment "for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act" is conceded by counsel for the Government upon the authority of our decision in the case of *Faber, Coe & Gregg, (Inc.)* v. *United States,* 19 C. C. P. A. (Customs) 8, T. D. 44851, and cases therein cited.

The decision of the trial court was based upon two distinct grounds, the first being, in substance, that the merchandise as a new article produced in Canada does not fall within paragraph 1615, *supra,* and the second that, even if it be granted, "for the sake of argument," that the merchandise does fall within that paragraph Congress nevertheless evidenced an intention in the Revenue Act of 1932 to impose the tax which was here assessed and collected. In other words, as we understand that part of the court's decision, the majority took the view that, with respect to merchandise taxed by the revenue act, the provisions of paragraph 1615 of the tariff act were, in effect, abrogated or superseded.

In the original brief filed on behalf of the Government before us, argument was presented in support of both the foregoing grounds. During the oral argument of the case, however, and in a written sup-

plemental statement subsequently filed the Special Assistant to the Attorney General withdrew the contention relative to the second ground, and directed attention to T. D. 45803 (4), a ruling by the Customs Bureau, to the effect that articles described in section 601 of the Internal Revenue Act of 1932 may be imported free of tax under the conditions set forth in paragraph 1615 of the Tariff Act of 1930 and the regulations thereunder, if such goods fall within the provisions of such paragraph.

Another point was made in the Government's brief before us which, so far as the record shows, was not presented to or considered by the trial court. It relates to a certain tax provided in section 604 of the Revenue Act of 1934. The contentions of the Government's original brief upon this point were also withdrawn during the oral hearing before us and in the supplemental statement filed, upon the authority of the Supreme Court's decision in the case of *Spalding & Bros.* v. *Edwards*, 262 U. S. 66.

While concessions of counsel on questions of law only are not binding upon the courts they are always treated with great respect, and, in any event, in view of the conclusion at which we have arrived relative to the first ground upon which the trial court's decision was based, we shall omit any discussion of the withdrawn contentions.

In the decision of the trial court the majority said:

Admittedly, the merchandise at bar has not been "advanced in value or improved in condition by any process of manufacture or other means," as provided in paragraph 1615; yet it is a new product derived from refining crude petroleum. It is used for other and different purposes than the gasoline extracted from the original exportation, and is a distinct product from the gasoline extracted, with a different purpose, namely, the production of heat when used as a fuel.

Elsewhere in the majority opinion it was said (after a review of certain cases to some of which we shall later refer):

In the case at bar the merchandise is more than a residue. It is a new, separate, and independent article with a separate and independent use from the gasoline contained in the petroleum that went out.

Upon this basis the court held that the merchandise does not fall within the provisions of paragraph 1615, *supra.*

It will be observed from the quotation, *supra*, that the trial court found that the imported goods had "not been 'advanced in value or improved in condition by any process of manufacture or other means,' as provided in paragraph 1615" of the Tariff Act of 1930, saying that "admittedly" such was the case. Whatever may have been the situation before the trial court, counsel for the Government do not admit that here. The Government brief states:

The proof before the court shows that the imported article is of less value than that which was exported, but has advanced in value and improved in condition over its value and condition as exported as a constituent part of the crude petroleum.

This contention means, as we understand it, that the so-called "residue" had a greater value after its separation than it possessed while admixed with gasoline, and that it was improved in condition by the separating process, which process the Government contends was a process of manufacture. It is noted that the statute reads "without having been advanced in value or improved in condition by any process of manufacture *or other means*." [Italics ours.] So, it is unnecessary to dilate upon the refinements of meaning of the term "manufacture." However, it seems quite clear to us that the process by which the separation of materials was brought about was a process of manufacture, and the so-called residue in its condition as imported is a result of that process.

The Government has presented what is referred to as a mathematical formula upon which argument is based in support of its contention that the value of the so-called residue was advanced by reason of the processing which took place in Canada. The correctness of the formula is challenged by counsel for appellant and there is much argument pro and con upon this question. It is our view that this matter is one of secondary consideration. The first question to be determined is whether the imported merchandise is the merchandise that was exported. If it was the same, advance in value and improvement in condition are of importance; if it was not the same, value and condition are inconsequential here.

For the purpose of this case we proceed upon the theory that had the imported residue been produced in the United States, exported to Canada, and then returned in its precise condition as exported, it would clearly be a product resulting from a manufacturing process applied in the United States. But such is not the situation here.

Appellant carried a product of nature—crude petroleum—into Canada and there by a process of manufacture separated certain elements of that product from other elements. Appellant's primary object doubtless was to obtain the element known as gasoline, but in the very process of obtaining this element there was also obtained the merchandise involved. That the gasoline *per se* was a resultant of the process and that it was something distinct from the material exported seems clear, and to us it seems equally clear that the residue occupies the same status. The mere fact that it was not the primary article which appellant desired and that, in a sense, it was "unwanted" does not affect its *per se* status as an article resulting from a process of manufacture in Canada, nor does the fact that its production was an unavoidable result of the process used in obtaining the particular article primarily desired affect that status.

Appellant contends here, in substance, as evidently it contended before the trial court, that the case is practically on all-fours with the

cases of *United States* v. *Rubelli's Sons et al.*, 8 Ct. Cust. Appls. 399, T. D. 37645, and *United States* v. *Tower & Sons*, 9 Ct. Cust. Appls. 135, T. D. 37981, wherein the *Rubelli's Sons et al.* case, *supra*, was followed in part, and that the decisions in those cases are controlling here under the rule of *stare decisis*. Argument to the same effect is presented by *amicus curiae* in a brief filed by permission of the court.

In view of the emphasis which has been placed upon the *Rubelli's Sons et al.* case, *supra*, we think it appropriate to quote the following from this court's decision there rendered:

It appears from the record that soft spelter produced in the United States from zinc ores was exported in the form of cakes or blocks to Canada, where it was used by the Page Hersey Iron, Tube & Lead Co. for the so-called galvanizing of iron pipe. The process pursued by the company for the accomplishment of that purpose requires that the soft zinc spelter imported by it should be placed in iron tanks and brought to a molten condition by submitting the cakes or blocks to a temperature of about 800°. After being treated with sulphuric acid to remove scale, and with muriatic acid to secure a surface acceptable to the zinc, the iron pipes to be "galvanized" are immersed in the molten spelter, thereby coating them inside and out with a thin layer of zinc. It seems that the immersion of the cold pipes in the molten zinc produces some crystallization of the melted metal and the crystallized particles thus developed fall to the bottom of the tank, bringing down with them a percentage of the impurities picked up from the pipes.

The material so deposited is hard spelter which, from time to time, is drawn off into molds and redistilled to clear it of its impurities. Hard spelter contains from 92 to 94 percent of zinc, soft spelter from 94 to 98½ per cent, and soft spelter, redistilled from hard spelter from 99½ to 99.7 per cent. For "galvanizing," soft spelter produced from zinc ore is used. Redistilled soft spelter is too costly for any such purpose as that, and is employed in the making of brass and other alloys. Hard spelter has no use save that of remanufacture by distillation, and is worth only 82 per cent of the price of soft spelter derived from zinc ore.

On this state of facts it is very evident that what was exported from the United States was zinc, and that what came back was zinc, which, far from being improved in value and condition, was rendered useless except for remanufacture, and was not only of less value, but was really in a worse condition than when it passed from the United States into Canada. We must therefore hold that the article exported from the United States and subsequently returned thereto was zinc, neither advanced in value nor improved in condition.

In the *Tower & Sons case*, *supra*, one of the classes of merchandise involved was tungstic acid, evidently produced as an article of manufacture in the United States. It was exported to Canada in the condition of "an impalpable yellow powder" for use in the manufacture of tungsten wire for incandescent lamp fillings. Our opinion states that in use:

It is first dissolved in ammonia and the resultant insoluble materials filtered out. This rejected material is called an "insoluble residue" and consists of small lumps of clay-like material said to contain tungsten, lime, and other impurities. This is one of the substances imported and the subject of this appeal * * *.

It was held that such "insoluble residue" was ruled by the *Rubelli's Sons et al.* case, *supra*, and entitled to free entry under paragraph 404 of the 1913 tariff act, the pertinent language of which was the prototype of the language of paragraph 1615, *supra*. In the course of this court's decision upon this point it was said (after quoting from the decision in the *Rubelli's Sons et al.* case, *supra*):

> The process of production therefore of hard from soft spelter was but a process of segregation or elimination. So here the process of producing this "insoluble residue" is but a process of segregation or elimination, and the cases do not seem to be distinguishable. The processes applied are not manufacturing processes. No new article of manufacture is produced. United States *v.* Maine Central Railroad Co. (7 Ct. Cust. Appls. 114; T. D. 36427), and cases therein cited.

One distinction between the imported materials involved in those cases and the imported material at bar is that the former were obtained from articles which had been manufactured in the United States, while the material here was obtained from a product which was exported in its natural state. That difference alone, however, would not be controlling because paragraph 1615, *supra*, is not confined to manufactures, or even to articles derived from manufactures, exported from the United States, but embraces also the crudest of materials which are of United States origin.

An essential difference, it seems to us, lies in the fact that the hard spelter involved in the *Rubelli's Sons et al.* case, *supra*, and the "insoluble residue" of tungstic acid of the *Tower & Sons* case, *supra*, did not result from the processing of the materials from which they were derived for the purpose of changing the character or form of any element of the basic material, or for separating one element from another. The soft spelter exported was not processed to separate it into parts, as was the crude petroleum here, nor was the tungstic acid. The basic materials involved in those cases were applied immediately and directly to the manufacture of certain merchandise entirely different in character, and the respective residues of zinc and tungstic acid were not new articles.

In the instant case the crude petroleum was not applied to the making or finishing of extraneous manufactures, but was itself, and by itself, processed in a manner which resulted in new and distinctive articles—one being gasoline; the other being oil.

Other cases were cited by both parties to the case. These we have examined with care, but they do not alter our view upon what we conceive to be the fundamental feature of the case. Hence we do not review them here.

The judgment of the United States Customs Court is *affirmed*.