**AMERICAN MARITIME ASSOCIATION,**
Plaintiff,

and

**Shipbuilders Council of America,**
Intervening Plaintiff,

and

**Seafarers International Union of North America, AFL–CIO, Intervening**
Plaintiff,

v.

**Michael BLUMENTHAL, Secretary of the Treasury, Defendant,**

and

**Amerada Hess Corporation,**
Intervening Defendant.

Civ. A. No. 77–1508.

United States District Court,
District of Columbia.

Oct. 14, 1977.

850

Allan Abbott Tuttle and John Oberdorfer of Patton, Boggs & Blow, Joseph A. Klausner, Washington, D. C., for American Maritime Ass'n.

Richard E. Schwartz, Collier, Shannon, Rill, Edwards & Scott, Washington, D. C., for plaintiff-intervenor, Shipbuilders Council.

Howard Schulman, Schulman, Abarbanel & Schlesinger, New York City, for plaintiff-intervenor, Seafarers Intern. Union of North America, AFL–CIO.

Dennis A. Dutterer, Asst. U. S. Atty., Washington, D. C., for defendant Blumenthal.

Everett B. Birch, Birch, DeJongh & Farrelly, Charlotte Amalie, V. I., and Mark P. Schlefer, Kominers, Fort, Schlefer & Boyer, Washington, D. C., for defendant Amerada Hess Corp.

(All out of town counsel admitted pro hac vice).

## MEMORANDUM

GASCH, District Judge.

This case came before the Court on plaintiffs' motion for a temporary restraining order and preliminary injunctive and declaratory relief. The plaintiffs are the American Maritime Association (AMA) and intervenors Shipbuilders Council, and Seafarers International Union of North America, AFL–CIO (Seafarers Union). Defendants are Michael Blumenthal, Secretary of the Treasury, and intervenor Amerada Hess Corporation (Hess). On September 2, 1977, plaintiff AMA sought a temporary restraining order to enjoin the Secretary of the Treasury from permitting the Hercules, a foreign-flag vessel, or any other foreign-flag vessel from departing Valdez, Alaska, ladened with Alaskan crude oil for the Virgin Islands, where the oil will be processed and thereafter shipped to the United States mainland. Judge John H. Pratt of this Court denied the TRO on September 2, 1977. This Court ordered, with the consent of counsel pursuant to Fed.R.Civ.P. 65(a)(2), that the hearing on the motion for preliminary and final injunctive relief be consolidated.[1] This matter having been tried to the Court on the 3rd and 4th of October, 1977, the Court makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

## FACTUAL BACKGROUND

Defendant-intervenor Amerada Hess Corporation, a Delaware Corporation, and its subsidiaries are engaged in the exploration, production, purchase, transportation, and sale of crude oil and natural gas as well as the manufacture, purchase, transportation, and marketing of petroleum products. Of the two refineries that Hess presently owns, only the Virgin Islands refinery, with its deep-water port, is accessible by water. It has a present design capacity of about 700,000 barrels of crude oil per day and represents a capital investment of approximately $650,000,000. Hess owns or has under charter approximately thirty-eight foreign-flag and seven United States-flag tankers.

In 1969, after having acquired .5% interest in the Prudhoe Bay field on the North Slope of Alaska, Hess expanded its refinery facility to increase its daily refining capacity by 160,000 barrels per day. In September of 1969, following press reports of Hess' intention to charter four foreign tankers to transport Alaskan crude oil to the Virgin Islands, Edwin Hood, President of the Shipbuilders Council of America, requested a ruling from the United States Customs Service as to whether the above-described transport would violate the Jones Act, 46 U.S.C. § 883 (1970), which, in brief, requires

---

1. The parties represented to the Court that the voyage from Valdez to the Virgin Islands *via* Cape Horn takes approximately forty days; the Hercules is scheduled to arrive in the Virgin Islands on or about October 13th. In light of this fact, the Court consolidated the hearing on preliminary injunctive relief and trial on the merits.

that transportation of merchandise by water between points in the United States, "either directly or via a foreign port," be accomplished in American vessels. The Acting Commissioner of Customs responded that a formal ruling could not be issued until a specific case was presented to the agency. However, he offered a preliminary view that such transportation would not violate the Jones Act, 46 U.S.C. § 883 (1970).

In late August of 1977, Edwin Hood was apprised of a "specific case." He informed the Customs Service that the Hercules, a foreign-flag tanker chartered by Hess, was scheduled to load at Valdez and requested a Customs ruling on this matter. The Customs Service responded on September 7, 1977, after the Hercules had departed from Valdez, that it intended to propose rulemaking on this matter.

On September 2, 1977, plaintiff American Maritime Association filed an application for a temporary restraining order prohibiting the Secretary of the Treasury, Michael Blumenthal, from approving the departure of the Hercules from Valdez. The Hercules, a ship of Liberian registry, was chartered by a subsidiary of defendant Amerada Hess Corporation, the American Hess Shipping Corporation, to transport approximately 1,466,000 barrels of crude oil having a value of approximately twenty million dollars from Valdez, Alaska, to the Virgin Islands.[2] In particular, plaintiff sought to enjoin the Secretary from (1) issuing to the Hercules or any other foreign-flag tanker a permit, pursuant to 46 U.S.C. § 313 (1970), or a clearance, pursuant to 19 C.F.R. § 4.84 (1977), authorizing the transportation of Alaskan crude oil from Alaska to the Virgin Islands; (2) permitting the Hercules or other foreign-flag tanker carrying Alaskan crude oil from entering a port of the Virgin Islands; and (3) permitting any ship carrying Alaskan crude oil, which has been shipped to and processed in the Virgin Islands, from entering any port in the United

States mainland. Judge Pratt denied plaintiffs' motion for a temporary restraining order.

The Hercules completed loading crude oil on the 3rd of September and departed the following day. Subsequent to the departure, Shipbuilders Council and the Seafarers Union intervened as party plaintiffs, and Amerada Hess Corporation intervened as party defendant.

On September 14, 1977, the Customs Service published a notice of proposed rulemaking in which it advanced the general view that the Jones Act is not violated if:

at an intermediate port or place other than a coastwise point (that is, at a foreign port or place, or at a port or place in a territory or possession of the United States not subject to the coastwise laws), it is manufactured or processed into a new and different product, and the new and different product thereafter is transported to a coastwise point.

42 C.F.R. § 46,068 (1977). Plaintiffs contended that the proposed rule would not adequately resolve the legal issues involved in the present case for two reasons. In order to obtain an adjudication on the specific facts presented, plaintiffs must request an advisory ruling from the Customs Service after the rulemaking process is completed. Second, as evidenced by the precedents considered in the notice of proposed rulemaking, the Customs Service would not consider the effect of the Magnuson Amendment to the Ports and Waterways Safety Act, 46 U.S.C. § 391a(7)(C) (Supp. 1977), on the Jones Act.

LEGAL BACKGROUND

Section 27 of the Merchant Marine Act of 1920, *as amended*, 46 U.S.C. § 883 (1970) (Jones Act), provides in relevant part:

No merchandise shall be transported by water, or by land and water, on penalty of forfeiture thereof, between points in the United States, including Districts, Territories, and possessions thereof em-

**2.** Another wholly-owned subsidiary of Hess owns the oil aboard the Hercules; Hess purchased 1,400,000 barrels from Standard Oil of

Ohio and obtained the remainder from Hess properties in the North Slope field.

braced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States.

The preamble to the Jones Act, 46 U.S.C. § 861 (1970), indicates its underlying policy:

[I]t is declared to be the policy of the United States to do whatever may be necessary to develop and encourage the maintenance of such a merchant marine . . . . [T]he Federal Maritime Commission and the Secretary of Commerce shall . . . in the making of rules and regulations, and in the administration of the shipping laws keep always in view this purpose and object as the primary end to be attained.

However, Section 21 of the same Act, 46 U.S.C. § 877 (1970), provides that the Virgin Islands is exempt from the application of the Jones Act:

[T]hat the coastwise laws of the United States shall not extend to the Virgin Islands of the United States until the President of the United States shall, by proclamation, declare that such coastwise laws shall extend to the Virgin Islands and fix a date for going into effect of same.

The Virgin Islands have remained exempt from the Act, since no United States President has issued such a proclamation. This exemption applies clearly to voyages that begin or terminate in the Virgin Islands. It does not apply to all shipments between points in the United States by way of the Virgin Islands, as this sequence of shipments may be considered under some circumstances transportation between points in the United States within the meaning of the Jones Act.

The legal issue presented in this case is whether the shipment of oil from Valdez, Alaska, to the Virgin Islands and the subsequent shipment of refined products from the Virgin Islands to the United States mainland is transportation between points in the United States embraced within the coastwise laws. In order to determine this issue, the Court must resolve two questions. As a threshold matter, the Court must determine whether the Magnuson Amendment to the Ports and Waterways Safety Act, 46 U.S.C.A. § 391a(7)(C) (Supp.1977), implicitly amends the Virgin Islands exemption to the extent that it would not apply if the merchandise involved is Alaska oil. If the Court finds that the Magnuson Amendment does not implicitly limit the application of the Virgin Islands exemption, then the Court must determine whether this shipment of crude oil constitutes two discrete shipments of different merchandise and hence is exempt from the Jones Act, or whether it constitutes one continuous voyage and thus is subject to the Jones Act.

STANDING

Defendants claim that all three plaintiffs lack standing in that they have failed to allege sufficient "injury in fact." However, it appears to the Court that each plaintiff has satisfied the requisites of standing.

The requirements for standing applicable to this action are set forth in the Administrative Procedure Act, 5 U.S.C.A. § 702 (Supp.1977). Section 702 grants standing in administrative law cases to persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." The Supreme Court in *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), articulated a two-point inquiry in cases where standing is based on Section 702 of the APA: first, the challenged action must have caused the claimant "injury, in fact, economic or otherwise." *Id.* at 152, 90 S.Ct. at 829. Second, the interest sought to be protected must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 153, 90 S.Ct. at 830.

■ The Court of Appeals for the District of Columbia Circuit recently has interpreted each of these points. In *Public Citizen v. Lockheed Aircraft Corp.,* 184 U.S. App.D.C. 133, 565 F.2d 708 (1977), the court addressed the meaning of "injury in fact" as it pertains to associational plaintiffs.

The injury must be palpable, concrete, and immediate. It required a claimant to "show a substantial probability that the requested relief would benefit him in some perceptible, tangible fashion." At 140, 565 F.2d at 715.

Each of the plaintiffs meets the "injury in fact" requirements set forth in *Public Citizen*. Plaintiff American Maritime Association is an unincorporated association of thirty-five independent United States-flag steamship companies that operate vessels in foreign and domestic trade, including those transporting crude oil by tanker from Valdez, Alaska to other ports in the United States. The AMA members presently operate about 1.5 million deadweight tons of tankers. This tonnage represents about one-half of the independent sector of the American-flag tanker fleet[3] and approximately one-fifth of the total unsubsidized Jones Act tanker fleet. It is true that no AMA member presently has available for Alaska trade a tanker equal in size to the Hercules, which has a capacity of 216,000 deadweight tons; however, several smaller tankers owned or operated by AMA members are currently "laid up" for lack of cargo and could be available for Alaskan trade.

Plaintiff-intervenor American Shipbuilders Council of America is an unincorporated association of most of the major shipbuilders, shiprepairers and ship component manufacturers in the United States. Twelve of the thirteen shipbuilders capable of building tankers for Alaskan oil trade belong to the Shipbuilders Council.[4] All six of the shipbuilding companies that are capable of building tankers of over 100,000 deadweight tons are members of the Shipbuilders Council.

Plaintiff-intervenor Seafarers International Union of North America, AFL–CIO, is an international union which is affiliated with unions representing in excess of 20,000 seamen employed in deep sea operations of United States-flag vessels, including those transporting oil to ports in the United States. Approximately twelve thousand of its members are eligible to work aboard United States-flag ships. Although its membership does not include all the unlicensed seamen eligible to work aboard Jones Act vessels, affiliates of the Seafarers Union have entered into collective bargaining agreements to man oil tankers owned and operated by American steamship companies. Several U.S.-flag tankers are "laid up" without cargo, because of the unavailability of oil cargo; as a result, union members are unemployed.

Upon the basis of the above facts, each plaintiff has alleged sufficient "injury in fact" to maintain standing. The testimony and papers presented to the Court strongly support the finding that if the instant transportation by foreign-flag tankers is not deemed a violation of the Jones Act, then whenever possible, foreign-flag rather than American-flag ships will be chartered for shipment of Alaskan oil to the Virgin Islands because of lower costs.[5] Thus, a substantial amount of trade will be diverted from the American shipping industry. American ship owners and operators, shipbuilders, and seamen will lose significant business and suffer economic harm.

Since it is impossible to determine in advance which particular ship owner, shipbuilder, or seamen will be harmed in the individual instance, it is not possible to state with certainty which of the members in the plaintiffs' associations will be harmed. Such a showing, however, is not required. *Public Citizen* requires only a showing that the "plaintiffs are within the class of persons whose interests are necessarily, or with substantial probability, af-

3. The independent sector does not include tankers that are owned by oil companies.

4. This figure includes shipyards that build 35,-000 deadweight vessels, since vessels that size have been delivered for use in one Alaskan oil trade.

5. The shipping cost of a voyage from Valdez, Alaska to the Virgin Islands *via* Cape Horn is $24.90 per ton for an American vessel and $5.85 per ton for a comparable foreign vessel.

fected by the challenged agency action." 565 F.2d at 716. The showing has clearly been established. Conversely, it is apparent that plaintiffs are within the class of people who would benefit if declaratory and injunctive relief were granted.

■ Moreover, several factors strengthen plaintiffs' standing position. Because plaintiffs seek to enjoin all future transportation of Alaskan oil to the United States *via* the Virgin Islands by foreign tankers, they need only show a substantial probability that at some point in the future one of their members would have been employed to carry the Alaskan oil. An association may maintain standing on behalf of its members, if it sufficiently alleges that its members, or some of them, have suffered "injury in fact." *See Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Given the nature of the relief sought and the number of members each plaintiff association or union represents, it is clear the injury is not remote and is "capable of direct redress by the court through the requested remedy." *Public Citizen,* at ——, 565 F.2d at 715.

Plaintiffs have also sufficiently met the second *Data Processing* standard—the zone of interests test—as recently interpreted by the Court of Appeals for this Circuit in *Tax Analysts and Advocates et al. v. Blumenthal,* 184 U.S.App.D.C. 238, 566 F.2d 130 (1977). The court, while acknowledging that the zone of interest is a generous standard, established a means of ascertaining the parties to be within "the zone of interests to be protected or regulated by the statute." The court required district courts to consider the statutory section challenged rather than other sections of the statute to determine the interests that are arguably to be regulated or protected. It noted that this approach was particularly appropriate in the context of the case before it, because the statute involved, the Internal Revenue Code, is extremely complex and does not have a "single, unified purpose." At 245, 566 F.2d at 141. Second, it stated that the

interest should be "arguable from the face of the statute." At 250, 566 F.2d at 142.

■ Upon application of these principles, plaintiff and intervenor-plaintiffs fall within the zone of interests to be protected by the Jones Act. The Jones Act is guided by a unified purpose. It is thus appropriate to examine the preamble to the Act that states the purpose underlying the statute: "It is declared to be the policy of the United States to do whatever may be necessary to develop and encourage the maintenance of such a merchant marine." 46 U.S.C. § 861 (1970). It is apparent that Congress considered American ship owners and operators, shipbuilders, and seamen to be protected by the statute.

The Court therefore concludes that plaintiff AMA and intervenors Shipbuilders Council and Seafarers Union have satisfied the standing requisites.[6]

## AVAILABILITY OF JUDICIAL REVIEW

Defendant Secretary urges dismissal on the ground that plaintiffs have failed to allege that any action or inaction by the Secretary has caused them injury. Defendant apparently contends that there is no final action by the Secretary reviewable by a court under Section 704 of the APA. The Secretary apparently also contends that this case is not ripe for adjudication.

■ In support of this position the Secretary argues that there has not yet been a violation of the Jones Act. According to the Secretary, a violation occurs only when there has been a "transportation" between points within the coastwise laws—in other words, only when the goods arrive and are unloaded in a United States port. The Secretary maintains that he has no authority under the statute and regulations to detain a foreign tanker or otherwise act to enforce the Jones Act until there has been a violation as defined above. Moreover, the sole mechanism for enforcement provided under the statutes and regulations is forfeiture of the goods when the goods arrive in the United States. 46 U.S.C. § 883 (1970).

**6.** In view of this Court's holding that plaintiff AMA has standing on behalf of its members, it is unnecessary to address plaintiff AMA's motion for class certification.

It appears that the Secretary's analysis of the statutory scheme is correct. Neither the statute nor the regulations give the Secretary or his delegates authority to prevent the Hercules or any other foreign-flag tanker carrying crude oil from Alaska to the Virgin Islands from departing Alaska, entering a port in the Virgin Islands, or entering a port in the continental United States, even if such transport were deemed a violation of the Jones Act.

In particular, the Secretary was required to issue clearance at Valdez, pursuant to 41 U.S.C. § 91 and 19 C.F.R. § 4.84, if the master of the vessel presented to the collector a manifest in accordance with 19 C.F.R. § 4.61. Section 91 of Title 46 provides:

> The master or person having the charge or command of any vessel bound to a foreign port shall deliver to the collector of the district from which such vessel is about to depart a manifest of all the cargo on board the same, and the value thereof, by him subscribed, and shall swear to the truth thereof; whereupon the collector shall grant a clearance for such vessel . . . .

Section 4.84 provides that if, as in the instant case, the master of a foreign vessel, departing from a port in noncontiguous territory of the United States for another port in noncontiguous territory of the United States, submits a manifest in accordance with 19 C.F.R. § 4.61, then "a clearance shall be granted." Section 4.61 requires the master to verify compliance with various statutes and regulations, none of which pertain to the Jones Act. Since plaintiffs have not alleged that the requirements of the manifest were not met and these provisions do not permit a clearance to be withheld on the basis that the Jones Act may be violated, plaintiffs have no basis to challenge the issuance of the clearance.[7]

■ Plaintiffs similarly fail to provide statutory authority upon which the Secretary could rely to deny entry in a port in the Virgin Islands or the United States. The sole enforcement mechanism available to the Secretary under the regulatory scheme is forfeiture pursuant to 46 U.S.C. § 883.

Under this analysis of the regulatory scheme, both ripeness and finality problems are presented. Notwithstanding the fact that the Jones Act has not yet technically been violated, the Court declines to dismiss this case on the grounds of ripeness. The Court bases it conclusion upon the standards and policy established in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). According to the *Abbott* court, the basic rationale of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies . . . ." *Id.* at 148, 87 S.Ct. at 1515. It is clear from the nature of the facts, parties, and interests involved that the instant controversy is not merely abstract. Moreover, this case withstands the two-part test set forth in *Abbott*, which requires the "evaluation of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1516. The issues here involve the interpretation of a statutory provision and the effect of a recent enactment upon a prior statutory provision. The factual matters in dispute pertaining to the Hess refining process will not be different at the time the goods arrive in the United States. Finally, the Court finds that plaintiffs and defendant Hess have sufficiently demonstrated the importance to their respective interests of resolving the issues immediately.

■ In light of the above analysis of the enforcement scheme under the Jones Act, the Secretary's claim that no final agency action or inaction within the meaning of Section 704 of the APA has been alleged is more compelling. Indeed, plaintiffs have

---

7. The Court finds that the other provision which plaintiff cites, 46 U.S.C. § 313 (1970), is inapplicable to this case. The section applies to foreign vessels departing for districts in the United States. The Virgin Islands are not included in these districts. *See* 46 U.S.C. § 293 (1970).

not clearly articulated the agency action upon which their request for judicial review is based. Apparently, they consider the grant of the clearance by the collector to be reviewable final agency action. Particularly since the issuance of a clearance is a nondiscretionary act if a manifest in compliance with the regulations is presented to the collector, the issuance of the clearance does not appear to be final agency action within the meaning of section 704. While final action may be informal action, courts have generally required that one of the following elements be present: direct and immediate impact on the regulated industries as a result of this action; reliance by the regulated parties on the action; the agency action is the final agency consideration of the matter or represents the final, crystallized agency position on the matter; a high level agency official is directly responsible for the action. *See, e. g., Abbott Laboratories v. Gardner,* 387 U.S. 136, 149–53, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 283–287, 443 F.2d 689, 698–702 (1971). The instant agency action, the issuance of the clearance by the Customs inspector, seemingly contains none of these elements.

## MERITS

Assuming, however, that the issuance of the clearance reflects the definitive agency position on the applicability of the Jones Act to the instant transportation and thus is final agency action reviewable under the APA by this Court at this time, the Court must nevertheless deny the plaintiffs' request for relief. First, the Court concludes that the Magnuson Amendment to the Ports and Waterways Safety Act, 46 U.S.C.A. § 391a(7)(C) (Supp.1977), does not implicitly limit the application of the Virgin Islands exemption as it applies to Alaskan oil. Second, the Court finds that continuity of transportation is broken if the merchandise is changed into a new and different product at an intermediate exempt port, and crude oil processed at the Hess refinery is transformed into new and different products. Thus, the transportation of Alaskan

crude oil on the Hercules from Valdez, Alaska to the Virgin Islands does not violate the Jones Act.

### A. The Effect of the Magnuson Amendment on the Jones Act.

Plaintiff-intervenor Seafarers Union contends that the 1973 Magnuson Amendment to the Ports and Waterways Safety Act, 46 U.S.C.A. § 391a(7)(C) (Supp.1977), implicitly limits the application of the Virgin Islands exemption to the Jones Act, 46 U.S.C. § 877 (1970). The Magnuson Amendment was enacted as part of a statute that regulates various aspects of the trans-Alaska delivery system. Pub.L. 93–153. Section 391a of Title 46 generally relates to the rule and regulations to be issued by the Secretary of Transportation; the regulations were to set forth minimum standards of design, construction, alteration, and repair for the purpose of protecting the marine environment. Plaintiff Seafarers Union relies on the amendment, indicated by the underscored portion of the following quote, as evidence of the Congressional intent to limit the Virgin Islands exemption:

(C) Rules and regulations published pursuant to subsection (7)(A) shall be effective not earlier than January 1, 1974, with respect to foreign vessels and United States-flag vessels operating in the foreign trade, unless the Secretary shall earlier establish rules and regulations consonant with international treaty, convention, or agreement, which generally address the regulation of similar topics for the protection of the marine environment. In absence of the promulgation of such rules and regulations consonant with international treaty, convention, or agreement, the Secretary shall establish an effective date not later than January 1, 1976, with respect to foreign vessels and United States-flag vessels operating in the foreign trade, for rules and regulations previously published pursuant to this subsection (7) which he then deems appropriate. Rules and regulations published pursuant to subsection (7)(A) shall be effective not later than June 30, 1974,

with respect to United States-flag vessels engaged in the coastwise trade.

46 U.S.C.A. § 391a(7)(C) (Supp.1970). Plaintiffs argue that the legislative history conclusively demonstrates that Congress required the completion of safety, environmental, and construction standards on United States-flag vessels at an earlier date in order to provide the greatest possible environmental protection for the marine leg of the trans-Alaska delivery system. Plaintiffs claim that the text of the amendment and the legislative history reveal that Congress intended and presumed that Alaskan oil could only be transported to the United States in American-flag vessels.

In support of this position, plaintiffs have presented numerous passages from the Congressional Record evidencing, at the very least, the belief of several legislators that the imposition of stricter standards on American ships would affect the marine leg of the Alaskan oil delivery system. Typical of the passages cited are the remarks by Senator Magnuson, who introduced the amendment:

> This amendment would simply require the Coast Guard to implement the mandate of Public Law 92–340 at an earlier date for vessels in the domestic trade and, of course, for vessels in the Alaska trade.
>
> I feel this amendment is basic to the safety of the marine leg of the Alaska system.

119 Cong.Rec. 22,837 (1973). It is fair to infer from the remarks of these legislators that at least some believed that Alaskan oil *en route* to any point within the United States, including a port in the Virgin Islands, would be required to be transported in American-flag tankers.

Notwithstanding this inference, there is no basis for plaintiffs' position that the Magnuson Amendment implicitly limits the Virgin Islands exemption to the Jones Act as it applies to Alaskan oil. First, the statutes as written are clear and unambiguous. Absent a patent ambiguity or conflict, the court will presume that the two provisions can be read consistently with each other. Second, the doctrine of repeal by

implication is not favored in this jurisdiction, *See Committee for Nuclear Responsibility, Inc. v. Seaborg*, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971); accordingly, the Court looks with disfavor upon this contention of partial repeal by implication. Third, the fact that it appears from the legislative history that several legislators believed that only American-flag ships were permitted to transport Alaskan oil from Alaska to the Virgin Islands is insufficient. The Congressional intent to amend the Virgin Islands exemption must also be evident. However, the Virgin Islands exemption to the Jones Act was not even mentioned. As the Court of Appeals for this Circuit noted:

> [W]hether a statute is repealed by a later one, on the ground of repugnancy or substitution, is a question of legislative intent and . . . where powers or directions under several acts are such as may well exist together, an implication of repeal cannot be allowed. The intent of the legislature to repeal must be clear and manifest.

*Ritholz v. March*, 70 App.D.C. 283, 285, 105 F.2d 937, 939 (1939). Finally, if Congress truly intended to require only American-flag vessels to transport Alaskan oil to the Virgin Islands, it would have legislated to that effect.

B. *Jones Act Violation.*

Plaintiffs premise their claim that the transportation of crude oil on the Liberian-flag Hercules from Valdez, Alaska to the Virgin Islands, where the oil will be refined and the refined products transported to the United States by a foreign-flag vessel, violates the Jones Act on two theories. Plaintiffs' first argument is that continuity of transportation within the meaning of the Jones Act is based upon the shipper's intent at the time of initial departure as to the ultimate destination. They contend that even if the goods shipped are substantially changed at the intermediate point, continuity of transportation is established where the shipper, at the beginning of the voyage, clearly evidences his intent ultimately to return the goods to a point within the United States. Plaintiffs' second argument is

that even if the Court finds that a substantial change in the goods at the intermediate point destroys the continuity of transportation and renders the Jones Act inapplicable, the Jones Act still applies in the instant case. They contend that the Hess refining process does not cause a substantial enough change in the nature of the merchandise to qualify it for an exemption from the Jones Act.

This case presents an issue of first impression. Indeed, neither case law nor administrative precedent addresses this issue in a similar factual context.

### 1. Continuity of Transport.

The Court must first ascertain the proper standard for the determination of continuity of transportation under the Jones Act. Plaintiffs maintain that whether a voyage is considered terminated for purposes of the Jones Act is based on the shipper's intent at the time of departure as to the ultimate destination of the merchandise. According to this view, the voyage terminates at the point of ultimate destination. They argue that intent rather than stoppage or interruption is controlling where intent is clearly manifested. Such factors as the processing of the goods at the intermediate point are only relevant when intent is unclear; only then may processing be used as one of the indicia from which to infer intent.

Plaintiffs rely upon two opinions of the Attorney General that involve the Jones Act to support this position. In one case, the shipment of fish from Alaska to Vancouver, where they were stored for periods between four months and a year, and then to the United States was considered a "continuous" voyage subject to the Jones Act. The Attorney General noted:

> A transportation from one point to another remains continuous, so long as intent remains unchanged, no matter what stoppages or transshipments intervene.

> \* \* \* \* \* \*

> [E]ven the landing of goods and payment of duties does not interrupt the continuity of the voyage of the cargo, unless there is an honest intention to bring them into the common stock of the country.

32 A.G. 350, 352 (1920), citing The Bermuda, 70 U.S. (3 Wall) 514, 18 L.Ed. 200 (1865).

However, the opinions of the Attorney General do not adequately support plaintiffs' view. In both cases, the goods did not undergo substantial change at the intermediate port. Thus, at most, these cases provide authority for the position that intent is controlling where the goods were merely transshipped at the intermediate port.

Plaintiff AMA suggests a second argument in support of its theory that intent is determinative of the issue of continuity of transit: It urges the Court to adopt the standard for determination of continuity of transport employed in the regulation of interstate commerce. See, e. g., Board of Trade v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1922). In these cases, intent is the prevailing standard. Plaintiff asserts that the commerce clause precedent is consistent with the purposes and manner in which Congress intended the Jones Act to be implemented.

The Court, however, finds plaintiffs' argument unpersuasive and adopts the position advanced by the defendants. Defendants contend that intention is a necessary element only when the same merchandise is shipped between points in the United States via an intermediate port. Intent is irrelevant if the merchandise is substantially changed at the intermediate port. Defendants claim that if the product is substantially changed, then the "merchandise" in the first shipment, from the point of departure to the intermediate port, is different from that in the second shipment, from the intermediate point to the point of ultimate destination. Thus, for purposes of the Jones Act, the shipment terminates at the intermediate port.

Defendants rely on the rulings and interpretations of the Customs Service and its predecessor agency. One of the Customs Service rulings, Treasury Decision 56272(2) (1964), involved partially-milled rice that was transported by a foreign vessel from California to the Virgin Islands, where it

was brushed, screened, coated, polished, and fortified, and then transported by foreign ship to Puerto Rico. The continuity of transport was deemed to have been broken at the intermediate port. In another ruling, oil was transported from the United States Gulf Coast to Aruba, where it was blended with oil of foreign origin to produce low-sulphur fuel oil. The transportation was deemed to terminate in Aruba. Treasury Decision 66–244(1) (1966). Thus, in both of these cases, where the product underwent change at the intermediate point of shipment, the Jones Act was deemed not to apply.

In 1969, in response to a request by plaintiff Shipbuilders Council for a ruling on the facts presented by the instant case, the Commissioner of Customs issued the following letter:

In a number of cases involving the transportation of merchandise between coastwise points by way of an intermediate foreign port at which the merchandise underwent some form of processing, the Bureau has held that if the main purpose of the transportation was to have the merchandise thus processed and if the processing was not merely incidental to an intended transportation between American ports, the processing will be deemed to have broken the continuity of the transportation so that the return of the processed merchandise to the U.S. would not violate section 883, Title 46, U.S.C.Code, although all or part of the transportation was by foreign vessel. Ordinarily, we consider that processing was substantial if it changed the merchandise physically, improved its condition and advanced it in value, so that after processing, it was a new and different product; and that the fact that the foreign processing was substantial tended to establish that having it done was the main object of the exportation rather than merely incidental to an intended transportation between coastwise points.

We are inclined to say at this time and on the basis of the bare facts outlined by you that the transportation would not be prohibited under the coastwise law.

Letter to Edwin M. Hood, October 15, 1969. The Customs Service apparently has consistently maintained this view. As it stated in its recent Notice of Proposed Rulemaking:

The Customs Service and the former Bureau of Marine Inspection and Navigation, its predecessor agency in the administration of the coastwise laws, have ruled since 1938 that if merchandise is transported from a coastwise point to a port or place not subject to the coastwise laws, such a port or place in Canada or the Virgin Islands of the United States (to which the coastwise laws expressly do not apply—Executive Order No. 9170 of May 21, 1942), where it is manufactured or processed into a new and different product which thereafter is transported to a coastwise point, either segment (or both segments) of the overall transportation may be accomplished by vessels not qualified to engage in the coastwise trade. The rationale is that the continuity of the transportation is broken at the intermediate port or place and that the new and different product resulting from the manufacturing or processing is not the same as that laden at the initial coastwise point.

42 Fed.Reg. 46068 (1977). Accordingly, the Customs Service proposed the following rule:

[m]erchandise is not transported coastwise if at an intermediate port or place other than a coastwise point (that is, at a foreign port or place, or at a port or place in a territory or possession of the United States not subject to the coastwise laws), it is manufactured or processed into a new and different product, and the new and different product thereafter is transported to a coastwise point.

42 Fed.Reg. 16,068 (1977).

Upon full consideration of the arguments of all the parties and the pertinent authorities, the Court concludes that the agency interpretation is both reasonable and consistent with the statutory scheme of

the Jones Act. Particularly in light of the Customs Service's long-standing interpretation and the principle that a statutory interpretation by an agency responsible for the administration of the statute is entitled to great weight, *see Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), the Court adopts the interpretation of the Customs Service that continuity of transport is broken when the merchandise is manufactured or processed into a new and different product.

### 2. *Substantiality of the Change.*

■ The Court will now discuss the extent of the change in the crude oil that results from the refining process. Next, it will determine whether such change is substantial enough to constitute a new and different product, thus exempting the transportation of the crude oil from the Jones Act.

The Hess refinery in the Virgin Islands, which represents a total capital investment of approximately $650,000,000 presently has a design capacity of approximately 700,000 barrels of crude oil per day and has docking facilities to receive crude oil transported by tankers. The Hess refinery includes crude oil and product storage tank facilities, six crude oil distillation units, catalytic platforming units, one jet fuel catalytic desulphurization unit, a kerosene catalytic desulphurization unit, No. 2 oil catalytic desulphurization units, vacuum distillation units, catalytic vacuum gas oil desulphurization units, sulphur recovery units, aromatic recovery units producing benzene, toluene and mixed xylenes and a paraxylene petrochemical unit.

Crude oil, upon arrival at the Hess refinery, is stored in floating-roof crude oil storage tanks. It is then transferred to a crude distillation unit, where it is heated by heat exchangers and direct-fired heaters to temperatures ranging from 500 to 650 degrees F. It then enters the crude distillation or fractionating tower, where seven unfinished products are separated out according to their boiling points. These products include fuel gas, light straight run, heavy naphtha, kerosene, No. 2 oil, heavy atmospheric gas oil, and unfinished residual fuel. After further distillation and other changes,[8] these unfinished products are transformed into finished products that meet industry specifications. The finished products include gasoline, jet fuel, distillates, various low sulphur residual fuel oils, and basic petrochemical products consisting of benzene, toluene, mixed xylenes and paraxylenes.

Alaskan oil that is refined at the Hess refinery will yield the following products in the following amounts:

| Product | % Volume | |
|---|---|---|
| benzene | .47 | |
| toluene | 2.23 | |
| xylene | 0.27 | |
| paraxylene | 1.08 | |
| regular gasoline | 4.19 | |
| premium gasoline | 4.19 | |
| unleaded gasoline | 3.00 | |
| jet fuel | 8.70 | |
| No. 2 Oil | 14.50 | |
| No. 6 Oil | 55.82 | |
| sulfur pellets | 0.30 | |
| | 94.75 | total marketable product recovery |
| | 5.25 | fuel gas equivalent [9] |

Benzene, toluene, xylene and paraxylene are petrochemicals used in the manufacture of finished chemical products. Jet fuel is used as fuel for jet aircraft, and gasoline as fuel for motor vehicles. Sulphur is used in the manufacture of fertilizers and pharmaceuticals. No. 2 oil is used as home heating oil. No. 6 oil is used as fuel by power

8. For example, naphtha is charged to catalytic platforming units, where the naphtha molecules undergo a molecular change: Naphthene molecules are converted to aromatic molecules. Unfinished jet fuel, kerosene, No. 2 oil, and residual fuel oil are desulphurized. Pitch is blended with desulphurized vacuum gas oil (separated from unfinished residual fuel oil through a vacuum distillation process) to produce No. 6 oil. Pure elemental sulphur is produced from the hydrogen sulphide gas removed from the various products.

9. *See* Defendant Hess' Exhibit No. 2.

plants.[10] Each of these products is different in name, physical and chemical character, and use from each other and from crude oil. Moreover, crude oil cannot be used for any of these purposes.

Notwithstanding plaintiffs' protestations to the contrary, all the credible evidence of record conclusively demonstrates that the products of the Hess refinery are new and different merchandise from the Alaskan crude oil. Clearly, the change involved in the instant case is more substantial than that involved in the two Customs Service Rulings discussed above, where the Customs Service determined that there existed a substantial enough change in the product to preclude a finding that the Jones Act applied. The Court finds further support for its position in *Shell Oil Co. of Canada, Ltd. v. United States,* 27 C.C.P.A. 94 (1939), where the nature of the change resulting from oil refining was examined in a different context. In that case, the Court of Customs and Patent Appeals determined that refined products are different "merchandise" from crude oil for purposes of the Revenue Act of 1932.

Thus, the Court concludes that continuity of transportation within the meaning of the Jones Act is broken if the merchandise is substantially changed into new and different products at the intermediate port. Crude oil is changed into new and different products through processing at the Hess refinery. Thus, the transportation of crude oil by the Hercules or any foreign-flag tankers from Valdez, Alaska to the Virgin Islands, where the oil is refined and thereafter the products are shipped to the United States mainland, is not a violation of the Jones Act. Preliminary and permanent injunctions are denied and the case is dismissed.

**10.** Despite plaintiffs' contention that crude oil and No. 6 fuel oil are interchangeable for many purposes, the Court finds that the No. 6 oil produced by Hess is also different in name, characteristic, and use from crude oil for the following reasons: (a) crude oil generally has a "flash point" of room temperature or less, whereas No. 6 oil has a "flash point" of at least 150 degrees F.; (b) the No. 6 oil produced by Hess is lower in sulphur content than the Alaskan crude oil; (c) No. 6 oil has a higher BTU content per barrel than does crude oil, and (d) No. 6 oil is used as fuel by power plants and industrial facilities, whereas Hess has never sold crude oil for use as a fuel.